MARCIA S. FULTON, administratrix, *vs.* THE EDISON
ELECTRIC ILLUMINATING COMPANY OF BOSTON.

Middlesex.    April 5, 1939. — May 25, 1939.

Present: FIELD, C.J., DONAHUE, DOLAN, COX, & RONAN, JJ.

*Negligence*, Invited person, In use of electricity, Contributory, Violation
of law. *Proximate Cause.* *Evidence*, Presumptions and burden of
proof, Of conscious suffering. *Electric Company.*

Evidence, that an electric light company maintained wires upon a pole,
the ownership of which did not appear, to furnish electric current for
flood lights maintained by a city on the pole for its playground, and
that the company was paid by the city for the current, warranted a
conclusion that a workman of a private contractor had the status
of an invitee of the company while upon the pole to change a lamp
of the flood lights under orders of the city's superintendent of play-
grounds.

Maintenance by an electric light company upon a pole of high tension
wires "dead ended" but with no tape wrapped around their ends,
thus leaving the cores exposed, the absence of tape tending to indi-
cate that the wires might be "dead," warranted a finding of negli-
gence toward an experienced workman of a private contractor who
had the status of an invitee upon the pole and whom it had not warned
of the condition of the wires.

A plaintiff was not bound by testimony of witnesses called by him which
tended to disprove his case where testimony of other witnesses sup-
ported it.

A finding of conscious suffering of one electrocuted on an electric light
pole was warranted by evidence that his moans and groans accom-
panied by motion of his body were heard for over seven minutes, and
by the opinion of a physician as to the significance of those facts.

A ruling that an experienced workman, electrocuted on an electric light
pole, was guilty of contributory negligence as a matter of law because
he did not take precautions against dangers of which he must have
known, and did not wear rubber gloves, properly was refused where
the evidence as to the obvious character of the danger and whether
he wore rubber gloves was contradictory.

In the absence of evidence of a causal connection between a failure of
an electric company to comply with § 31 of G. L. (Ter. Ed.) c. 156,
requiring it to mark a pole with its name or initials, and the death of
a workman electrocuted on the pole, no question of negligence of the
company arising from such failure should have been submitted to
the jury.

TORT. Writ in the Superior Court dated October 14, 1936.

Before *Dowd*, J., verdicts for the plaintiff were returned in the sum of $4,687.50 on the count for causing death and of $1,450 on the count for conscious suffering.

*J. W. White*, for the defendant.

*R. H. Lee*, for the plaintiff.

Cox, J. This is an action of tort to recover upon a declaration in two counts, one for the death (G. L. [Ter. Ed.] c. 229, § 5), and the other for the conscious suffering of the plaintiff's intestate, hereinafter referred to as Fulton, alleged to have been caused by the defendant's negligence. The answer is a general denial, that the intestate was contributorily negligent and that he voluntarily assumed the risk. The case was tried to a jury, which returned a verdict for the plaintiff on each count. The defendant's exceptions are to the denial of its motions for a directed verdict on each count and to portions of the judge's charge.

The jury could have found that Fulton was in the general employment of the defendant but that he worked occasionally, with the defendant's permission, for one Pike, an electrical contractor. On February 21, 1936, which was Fulton's "day off," he was employed by Pike to change a lamp of a floodlight, and, while at work, received an electric shock which caused his death. Pike had received an order from the superintendent of the playgrounds of the city of Newton to change the lamp. The floodlight in question was located upon the cross arm of a pole, hereinafter referred to as pole #2, which stood upon land, owned by the city of Newton, between Crystal Lake and Lake Avenue, a street not far from the water's edge. Directly across Lake Avenue in a westerly direction from pole #2, and at the intersection of Lake Avenue by Lakewood Road, there was another pole, hereinafter referred to as pole #1. Southeasterly from pole #2, at the water's edge, there was a third pole, hereinafter referred to as pole #3. Pole #2 was erected in 1911, and the floodlights were first placed upon it by Pike in 1928. The record does not disclose by whom poles #2 and #3 were erected. In

the summers of 1932 and 1933, water pageants were held at the lake, and the defendant, at the expense of the city of Newton, constructed a light tower near pole #3, and did all the necessary wiring for the pageant. As a part of this work, the defendant ran two "primary," number four copper wires, each carrying twenty-three hundred volts, from the upper cross arm on pole #1 to the upper cross arm on pole #2, and thence to pole #3, from which they ran to the light tower. After the pageant in 1933, these primary wires were cut at pole #2 and were removed between poles #2 and #3, but were allowed to remain between poles #1 and #2. These wires were "dead ended on the top straightway cross arm on pole #2 . . .," that is, "one primary wire was wound around the glass insulator and then back over itself which is, strictly speaking, a dead end and the other primary wire was tied on to the glass insulator with a second short piece of wire called a tie wire, then the end of the primary wire was turned up so that it would not slip through the tie wire . . . no tape was wrapped around either of these ends so that the copper wire that formed the core of the primary wire was exposed."

Secondary wires carrying one hundred fifteen volts ran from pole #1 to the lower cross arm on pole #2 and supplied the current for the floodlights which were erected upon the top cross arm of pole #2, where the primary wires were dead ended. The primary wires had no connection with the floodlights. From the lower cross arm on pole #2 the secondary wires ran down the pole to a "switch meter box," four or five feet above the ground, and thence back to the floodlights.

On the day in question, Fulton climbed pole #2 to change a lamp and when next observed his body was hanging over a cross arm. His body was removed within one half to three quarters of an hour, and was thereupon examined by a physician who found burns upon both hands and small hemorrhages on the forehead. There was no breath, heart sounds or pulse. Artificial respiration was applied without result. A physician testified that in his opinion the current passed from one hand to another "presumably through the

plaintiff's intestate's heart and vagus nerve, which caused death; . . . that in his opinion the plaintiff's intestate must have been in contact with the primary wires . . . ." It could have been found that "the dead ending on this pole was mechanically a good workmanlike job but that electrically it was not, as there should have been some protection in the form of tape over the ends of the wire; that rubber tape or varnished cambric covered with friction tape should have been used; . . . that installation of flood-lights and primary wires on the same cross arm was not common practice and was not good engineering; . . . that having the primary wires and the floodlights on the same cross arm is not a safe setup . . . ." From the testimony of an electrical expert called by the defendant, it could have been found that the use of rubber tape covered with friction tape on dead ends would not be practical as a safety device unless the rubber tape were carried out some distance from the pole.

The defendant contends that even if it was negligent, the plaintiff cannot recover for mere negligence for the reason that the status of Fulton was that of a bare licensee. The record does not disclose either the ownership of pole #2 or by whom it was erected. It stood upon land owned by the city of Newton. There was evidence from a division head of the defendant, whose division included the Crystal Lake area, that he was familiar with the electrical appliances in that area; that pole #1 was known to the Edison company as pole 248/1 on Lakewood Avenue; that there were tele-phone wires upon it, and pole tags bearing the names of the telephone company and the defendant; that pole tags are put on all "Edison poles"; that there were letter markings on the top cross arm of pole #1 under the wires, but that pole #2 had no name tag on it "as far as he knew," and the wires on that pole had no tags on them. The evidence goes no farther than to disclose a pole erected upon land of the city of Newton, which supported wires designed solely for the purpose of transmitting current for the use of the city. It also appears that when the primary wires, for purposes of the pageant, were extended to poles #2 and #3, on which

latter pole there was a transformer, "the order for the transformer and current to the light tower was for a definite period of one week; that at the end of that period the light tower was taken down and the wires were removed between pole #2 and #3 . . .; that the reason they were not removed back to pole #1 in 1933 was because the company had had orders for their use on two successive years . . . ." The record does not disclose whether any issue was raised at the trial as to the ownership of pole #2. If we assume, without deciding, that pole #2 belonged to the defendant, we think the jury could have found that Fulton, while upon the pole, had the status of an invitee rather than that of a licensee, although there is no evidence of any express invitation. The defendant was supplying the current for the floodlights which appears to have been measured in the switch meter box. The inference is warranted that the defendant was paid for this current. It thereby was deriving a benefit from the use of the pole in connection with the floodlights placed thereon by the city of Newton. The floodlights needed adjustment at least once a year and sometimes oftener. Their lamps had an average life, so that they needed to be replaced from time to time. These facts the defendant must be held to have known, and also that workmen, other than its own, would, of necessity, climb the poles on occasions in order to keep the lights in proper working order, thereby enabling the defendant to derive a benefit from the sale of its electric current. The defendant, therefore, had a mutuality of interest in the visits of such workmen relating as they did to its business and the promotion of its pecuniary interests. In such circumstances the jury could have found that Fulton, at the time of his injuries, was upon the pole at the implied invitation of the defendant. *Plummer* v. *Dill*, 156 Mass. 426, 427. *Hart* v. *Cole*, 156 Mass. 475, 477. *Norris* v. *Hugh Nawn Contracting Co.* 206 Mass. 58, 60–62. *Statkunas* v. *L. Promboim & Son Inc.* 274 Mass. 515, 519. *Comeau* v. *Comeau*, 285 Mass. 578, 581–582. *Lanstein* v. *Acme White Lead & Color Works*, 285 Mass. 328, 329. *Brosnan* v. *Koufman*, 294 Mass. 495, 500. Furthermore, the judge instructed the jury, without objection, as fol-

lows: "Did they [the defendant] leave those wires in such a condition as they were not dangerous to use, or to those who in the course of their employment might go there, because the company must be held to expect that people would go up there in the performance of those functions." The case at bar is distinguishable from *Pilon* v. *Easthampton Gas Co.* 248 Mass. 57, and *Wurm* v. *Allen Cadillac Co.* 301 Mass. 413.

The defendant's duty to Fulton if he was an invitee was to use reasonable care to keep pole #2 in a reasonably safe condition for his use according to the invitation, or at least to warn him against any dangers attendant upon such use that were not known to him or obvious to an ordinarily intelligent person, and either were known or in the exercise of reasonable care should have been known to the defendant. *Murphy* v. *Avery Chemical Co.* 240 Mass. 150, 152, 153. *Kelley* v. *Goldberg*, 288 Mass. 79, 81. *Palmer* v. *Boston Penny Savings Bank*, 301 Mass. 540, 542. The jury could have found that necessary work upon the floodlights was rendered unsafe by the presence upon pole #2 of the high tension wires which were in an improperly insulated condition, and that such condition was either known or should have been known to the defendant.

But the defendant contends that its duty did not go to the extent of requiring it to warn Fulton, an experienced lineman, of the conditions existing on pole #2. There was testimony of two witnesses, called by the plaintiff, tending to show that, to an experienced lineman, certain lettering on the cross arm of pole #1, from which the primary wires ran to pole #2, these letters being visible from the base of pole #2, and the position of the primary wires on these two poles, would make it obvious that there were high tension wires on pole #2, and that, therefore, the place in which Fulton was at work was dangerous. But there was other evidence that the absence of tape on the ends of the wires would tend to indicate "that the lines perhaps might be dead." See *Illingsworth* v. *Boston Electric Light Co.* 161 Mass. 583, 588. The jury was not required to accept the testimony of the two witnesses called by the plaintiff and

she was not bound by their testimony.  *Haun* v. *LeGrand*, 268 Mass. 582, 584, and cases cited.  *Salem Trust Co.* v. *Deery*, 289 Mass. 431, 435.  *Gordon* v. *Harris*, 290 Mass. 482, 485.  Compare *Connors* v. *Cunard Steamship Co. Ltd.* 204 Mass. 310, 321; *O'Callaghan* v. *Boston Elevated Railway*, 249 Mass. 43; *Murphy* v. *Boston Elevated Railway*, 262 Mass. 485.  There is no suggestion that the secondary wires could have caused any injury, and although the record does not disclose just what Fulton was doing when he sustained his injuries, nevertheless, in view of the permissible findings as to the lack of insulation at the ends of the primary wires and that Fulton's injuries must have come from contact with these wires, we are of the opinion that there was evidence of the defendant's negligence and of a causal connection between it and the injuries sustained.  *Gregory* v. *American Thread Co.* 187 Mass. 239, 242.  *Woodall* v. *Boston Elevated Railway*, 192 Mass. 308.  *Truedson* v. *Metropolitan Life Ins. Co.* 261 Mass. 121.  *Rash* v. *Albert*, 271 Mass. 247, 251.  *Shavelson* v. *Marcus*, 273 Mass. 237.  *McAuliffe* v. *Metcalfe*, 289 Mass. 67.  The case at bar is distinguishable from *Lyford* v. *Boston & Maine Railroad*, 227 Mass. 10; *Jabbour* v. *Central Construction Co.* 238 Mass. 453; *Walker* v. *Benz Kid Co.* 279 Mass. 533; *Bannister* v. *Berkshire Street Railway*, 301 Mass. 598, upon which the defendant relies.

We think that the evidence justified a finding that Fulton suffered consciously.  There was testimony of a witness that she came out of the house at the southwest corner of Lakewood Road and Lake Avenue, before Fulton's body had been removed from the pole, and heard moans and groans; that the groans continued for seven minutes or more and she saw him "wiggle for four to five seconds"; that she went back into the house and came out again, and then heard the moans and groans, and "observed movement in the plaintiff's intestate both times she came out."  It appeared that the moans were heard at a distance of one hundred fifty feet.  There was testimony from a physician that in his opinion if Fulton "wiggled and groaned for four or five seconds," he suffered consciously, and that "if

the groans continued over a longer period then he consciously suffered longer; that if the groans were heard one hundred fifty to two hundred feet away they would be more than the mere breaking down of respiration and that circulation still continues in the body although there is no pulse"; that noise from the mere expulsion of air from the lungs would not be heard for more than one hundred feet; and that "in the plaintiff's intestate we know from the hemorrhages that there was a certain amount of circulation going on and therefore stoppage of circulation in the brain and accompanying unconsciousness occurred later." A question for the jury was presented. *Boutlier* v. *Malden,* 226 Mass. 479, 487, 488. *Nadeau* v. *Taunton,* 247 Mass. 104, 106. *Royal Indemnity Co.* v. *Pittsfield Electric Co.* 293 Mass. 4, 8, 9. *Allison* v. *Sessa,* 302 Mass. 302.

It could not have been ruled as a matter of law that Fulton was guilty of contributory negligence. The defendant contends that he should have worn rubber gloves which would have protected him from injury; and also, that the evidence required a finding that he should have known of the danger — that the use of his own eyes should have apprised him of any danger. From the statement of Pike, who installed the floodlights, it appeared that he had been in the electrical business for over twenty years, that he had climbed the pole at other times, and that he had no idea that it had "high tension current." From what has already been said in discussing the duty of the defendant, we think it was a question for the jury to determine whether Fulton should have observed any danger, and, if he did not, whether, upon the permissible findings, such failure constituted contributory negligence. The only evidence bearing upon the question whether Fulton wore gloves came from a witness who climbed the pole after the fire department had put a ladder to the top cross arm. During the removal of the body a fireman stood on the top cross arm that carried the high tension wires. The witness testified that "he did not see any rubber gloves on the man . . . ." There was further testimony that rubber gloves are tested to withstand ten thousand volts. From this it is contended

that the burns on Fulton's hands indicated that he was not wearing gloves.  It was for the jury to say whether the testimony of the witness that he did not see any rubber gloves established the fact that Fulton was not wearing them.  In the case of *Mahan* v. *Newton & Boston Street Railway*, 189 Mass. 1, decided before the due care statute was passed, there was evidence that a rule of the company by which Mahan was employed provided that the linemen should treat every wire as a live wire, and that the company provided rubber gloves for men to use in handling dangerous wires.  There was evidence that the current that killed Mahan came from a trolley wire of the defendant, and also evidence tending to show that Mahan had no reason to believe, when he mounted the pole, that any of his company's wires were then dangerous.  It was said, at page 5, that, if such wires were not dangerous, "there was no occasion for him to use rubber gloves. . . . It would be going too far to say that in no case and under no circumstances would a lineman be justified in treating a wire as a dead wire because of the rule."

The defendant excepted to that part of the judge's charge that dealt with the alleged violation of the provisions of G. L. (Ter. Ed.) c. 166, §§ 30, 31, 34.  Section 31 provides, in substance, that a corporation shall plainly mark each pole supporting wires or cables containing wires over streets with the name or initials of the owner of such pole, and that wherever cross arms or other appliances for the support of wire or cables belonging to different owners are attached to the same pole, every such cross arm or other appliance shall plainly be tagged or marked with the name or initials of the owner thereof.  Section 34 provides that poles or other structures used to support lines for the transmission of electricity shall be insulated in such manner as to protect employees and other persons from accident.  Section 30 provides, among other things, that a corporation shall remove all wires, the use of which is abandoned.  The judge, after reading these sections to the jury, instructed it that poles and their structures should be properly marked and that the defendant had an "obligation . . . and a duty to

not allow those wires to be in any sense dangerous, in the sense that they weren't properly insulated under the law, and they should take those protections which here are set out in the law for the purpose of protecting its employees and others from the risk of danger from them. Now, then we come back to the question of whether or not the company fulfilled all the obligations on itself as regards the company's negligence."

Said § 34 in express terms applies only to the insulation of poles and other structures used to support lines for the transmission of electricity. It says nothing about the insulating of wires. There was no evidence that the pole or cross arm thereon was not properly insulated, and it was error for the judge to leave to the jury any possible question as to the defendant's duty as arising under said section.

The jury must have understood from the judge's charge that, if the defendant failed to mark pole #2 with its name or initials, this would be evidence of negligence and of a breach of the defendant's duty to Fulton. We have already discussed the absence of evidence as to the ownership of pole #2, but if we assume that it belonged to the defendant, and even though there was no evidence to show that it was marked with the name or initials of the defendant, nevertheless, we are of the opinion that it was error to leave any question to the jury as to the negligence of the defendant based upon the violation of said § 31 in connection with pole #2. It is true that a violation of a statute is evidence of negligence as to all consequences that the statute was intended to prevent. *Guinan* v. *Famous Players-Lasky Corp.* 267 Mass. 501, 516. In order to be the basis of liability, the evidence must establish causal connection between the violation of the statute and the injury to a plaintiff, and a "Violation of law is regarded as a cause of injury only when the forbidden element in the conduct alleged to be negligent is the effective cause of the damage sought to be fastened on the defendant." *Wainwright* v. *Jackson*, 291 Mass. 100, 102. Compare *Santa Maria* v. *Trotto*, 297 Mass. 442. We are unable to see any causal connection between the failure of the defendant to mark pole #2 with its name or

initials and the injuries which resulted in Fulton's death. Said § 31 had no application to the facts in the case at bar, and it was error for the judge to leave any question for the jury in connection with it and bearing upon the negligence of the defendant. *McDonough* v. *Vozzela*, 247 Mass. 552, 560. *Caron* v. *Lynn Sand & Stone Co.* 270 Mass. 340, 348. Upon a careful examination of the entire record we are of the opinion that these errors were prejudicial, entitling the defendant to a new trial. *Mabry* v. *Boston Elevated Railway*, 214 Mass. 463, 466.

Inasmuch as there must be a new trial, we do not consider it necessary to deal with the other exception of the defendant. At a new trial of the case the question may not arise, or, if it does, it may not be presented again in the same manner as it is now before us.

*Exceptions sustained.*