Lorena P. PIPPIN, in her capacity as Guardian and Next Friend of James Michael Green, Jr., Joshua Lee Green, and David Matthew Green, Plaintiff,

v.

POTOMAC ELECTRIC POWER COMPANY, et al., Defendants.

CIV. A. No. AW–98–3236.

United States District Court, D. Maryland, Southern Division.

March 6, 2001.

Joseph G. Petrosinelli, William E. McDaniels, Williams & Connolly, Washington, DC, for Plaintiff.

Martin H. Freeman, Mark A. Freeman, Freeman & Freeman, Rockville, MD, for Potomac Electric Power Company.

Stan M. Haynes, Anthony G. Lardieri, Semmes, Bowen & Semmes, Baltimore, MD, for Asplundh Tree Expert Company.

Jill E. O'Donnell, Peter Allan Woolson, Deborah L. Robinson, Robinson, Woolson & O'Donnell, L.L.P, Baltimore, MD, for Reilly Industries, Inc.

Carmen J. Martorana, Rockville, MD, for Willard Packaging Company, Inc.

### MEMORANDUM OPINION

WILLIAMS, District Judge.

Presently before the Court are the following motions: (1) Defendant Potomac Electric Power Company's ("PEPCO") Motion for Summary Judgment on the issue of Contributory Negligence; (2) Defendant Reilly Industries, Inc.'s ("Reilly") Motion for Summary Judgment; (3) Defendant Asplundh Tree Company's ("As-

plundh") Motion for Summary Judgment as to counts I, II, III, and IV; (4) Defendant PEPCO's Motion for Summary Judgment on the Absence of Duty or Breach of any Duty; (5) Defendant PEPCO's Motion for Partial Summary Judgment on Damages Resulting from Conscious Pain and Suffering; (6) Third Party Defendants Raymond W. Salkeld, S.L. and Willard Packaging Company's ("Willard") Motion for Summary Judgment; (7) Defendant Asplundh's Motion to Bifurcate; and (8) Defendant Asplundh's Motion to Exclude the Expert Testimony of Wallace O. Faison. Oppositions have been filed by all parties on all motions and replies have been filed by the movants. All motions are ripe for resolution. No hearing is deemed necessary. *See* Local Rule 105.6 (D.Md.). For the reasons discussed below, the Court will deny Defendant PEPCO's Motion for Summary Judgment on the Issue of Contributory Negligence. The Court will grant Defendant Reilly's Motion for Summary Judgment on the issue of the Statute of Repose. Additionally, the Court will grant Defendant Asplundh's Motion for Summary Judgment as to counts I, II, III and IV. Defendant PEPCO's Motion for Summary Judgment on the Absence of Duty or Breach of any Duty will be denied by this Court, along with their Motion for Partial Summary Judgment on Damages Resulting from Conscious Pain and Suffering. As for third party Defendant Salkeld and Willard Packaging Company's Motion for Summary Judgment, the Court will grant the motion. Defendant Asplundh's Motion to Bifurcate and Motion to Exclude the Expert Testimony of Wallace O. Faison are moot as they have been dismissed as a party pursuant to the Court's granting of their Motion for Summary Judgment.

The Court will also, *sua sponte*, dismiss: (1) Defendant Reilly's cross-claim against PEPCO and Asplundh; (2) Defendant Asplundh's cross-claim against Reilly; (3) Asplundh's cross-claim against PEPCO; (4) Asplundh's cross-claim against Salkeld; and (5) Defendant Reilly's cross-claim against Salkeld.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 13, 1996, James Michael Green, an experienced truck driver, was at District International Trucks ("DIT"), a truck parts retailer, to buy some air hoses for the brake line on his truck. Green was a frequent customer of DIT because he would purchase truck parts and then perform his own repair work. DIT is located in the Woodfield Road industrial park, across the street from Willard Packaging. According to the clerk who sold Mr. Green the brake lines that day, there was nothing unusual about his behavior and Green did not appear to be in a hurry. Plaintiffs' Consolidated Opposition to all Defendants' Motions for Summary Judgment on their Affirmative Defense of Contributory Negligence, Exhibit #10, at pg. 47–49. At some time around 5:00 p.m., Mr. Green's truck impacted a utility pole located on the side of the access road on Willard's property right across the street from DIT. The truck struck the pole head on. When the truck impacted the utility pole, the pole fractured 22′ 8″ above ground where there was a knot cluster in the wood. The split in the pole caused a 500–pound transformer, that was attached at the top of the pole, to collapse onto the cab of Green's truck. The collapsed transformer pinned Green to the steering wheel. According to the medical reports, Green died of asphyxiation approximately four to six minutes later. There was only one witness to the accident, David Ward, then an employee of E–Z Go located across the street from the accident. Unfortunately, Ward only saw the last couple of feet before the tractor trailer truck hit the utility pole. Other than the fact that Green and the truck hit the pole square on, there has been no determination as to what Green was doing at the time, or how the truck came to hit the pole.

Plaintiffs filed a six count complaint against Defendants PEPCO, as the owners of the utility pole, Asplundh, as the inspector of the utility pole, and Reilly, as the designer of the utility pole for product liability. The complaint alleges a survival action and a wrongful death action against all Defendants sounding in negligence, gross negligence, and punitive damages. Additionally, Plaintiffs brought a survival action and a wrongful death claim in strict liability against Defendants PEPCO and Reilly, only. Defendant PEPCO filed suit against third party Defendant Willard Packaging, as the owner of the property, for contribution and claiming that Willard owed a duty to PEPCO equal to that of a business invitee. Additionally, each Defendant brought a cross-claim against the other Defendant for contribution as well.

On September 2, 1999, this Court, by Memorandum Opinion and Order, granted Defendants' Motions to Dismiss the punitive damages portion of counts I, II, III, and IV. Furthermore, the Court denied Defendant Reilly's Motion for Judgment on the Pleadings based on the Statute of Repose on the grounds that discovery in the case was still in the early stages. The Court could not determine the Statute of Repose issue based on the pleadings alone. The Court directed the following questions to be answered on the issue: (1) whether the utility pole and transformers were newly installed; (2) whether there had been electrical service on the property prior to the pole's installation; and (3) who or what entity owned the property when the utility pole was installed. On December 20, 2000, this Court had a chance to revisit the instant case when, by Memorandum Opinion and Order, the Court granted Defendant PEPCO's Motion for Partial Summary Judgment on the strict liability claims in counts V and VI.[1]

### DISCUSSION

### I. Standard for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment will be granted when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While the evidence of the non-movant is to be believed and all justifiable inferences drawn in its favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transportation, Inc.*, 152 F.3d 326, 330–31 (4th Cir.1998); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985). To defeat such a motion, the party opposing summary judgment must present evidence of specific facts from which the finder of fact could reasonably find for him. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (citations omitted). Accordingly, in determining whether genuine and material factual disputes exist, the Court has reviewed the memorandums and the exhibits attached thereto, construing all facts, and all reasonable inferences drawn therefrom, in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### II Contributory Negligence

### A. Standard for Summary Judgment

■ Contributory negligence is an absolute defense to Plaintiff's negligence claims, even if defendant has been grossly negligent. *See Ramos v. Southern Maryland Electric Cooperative, Inc.*, 996 F.2d

---

**1.** *Pippin v. Potomac Electric Power Company,* 78 F.Supp.2d 487 (D.Md.1999).

52, 54–55 (4th Cir.1993). In other words, if the Plaintiff was contributorily negligent in any way, it will be unable to recover anything in damages, no matter how small the degree of negligence. *See Menish v. Polinger Co.*, 277 Md. 553, 558, 356 A.2d 233 (1976). Maryland law[2] defines contributory negligence as "the failure to observe ordinary care for one's own safety. It is the doing of something that a person of ordinary prudence would not do under the circumstances." *Menish*, 277 Md. at 558, 356 A.2d 233, *citing Potts v. Armour & Co.*, 183 Md. 483, 490, 39 A.2d 552 (1944). As the Maryland Court of Appeals has explained, it is "Conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and which is a legally contributing cause co-operating with the negligence of the defendant in bringing about the plaintiff's harm." *Craig v. Greenbelt Consumer Services, Inc.*, 244 Md. 95, 222 A.2d 836 (1966).

■ Ordinarily, a question of whether the plaintiff has been contributorily negligent is for the jury, not for the judge to decide. *Campbell v. Baltimore Gas and Electric Company*, 95 Md.App. 86, 93, 619 A.2d 213 (1993). However, the Court can take the issue of contributory negligence from the trier of fact and rule, as a matter of law, that there was contributory negligence when there are undisputed facts supporting such a finding. *Id.* at 94, 619 A.2d 213. The act relied upon to establish contributory negligence, as a matter of law, must be "distinct, prominent and decisive, and one about which ordinary minds would not differ in declaring it to be negligent." *Scaggs v. Zacharia*, 311 F.2d 488 (4th Cir.1962). Additionally, as this Court has previously stated, "Plaintiff may be found to be contributorily negligent as a matter of law where common experience reveals the foreseeable dangers of the plaintiff's actions." *Reid v. Washington*

*Overhead Door, Inc.*, 122 F.Supp.2d 590 (D.Md.2000).

## B. Theories Supported by the Evidence

All of the parties have submitted well developed and researched evidence to support their positions. The trouble in a case of this type, however, is that unfortunately, the complete truth will never be known because of the tragic death of Mr. Green. The Court and parties are in agreement with respect to the following key facts. Mr. Green's tractor trailer, while Green was in the cab, collided squarely with the utility pole located by the curb of the access road. There was no indication that the trailer was traveling at a high rate of speed, and there are no intermediate factors which contributed to the truck hitting the utility pole. When the truck hit the utility pole, the pole split at a height of 22' and 8". Due to the split in the pole, a 500–pound electrical transformer struck the cab of the truck. The collapse of the transformer onto the cab, killed Mr. Green. At this point the Court has been presented with evidence as to how the truck came to hit the utility pole. There was only one eyewitness to the scene to the incident, David Ward who worked across the street from the accident area. For the Court's purposes, Ward's testimony, while uncontradicted, only sheds partial light on the events which led to Green's death since he only witness the last couple of feet before the truck hit the utility pole. It is Ward's testimony that the truck appeared to be rolling into the pole. Data from the crash scene, including marks left on both the truck's bumper and the pole, indicate that the truck was going at a very low speed. Plaintiffs Consolidated Opposition, Exhibit # 27 at pgs. 23–24. When Ward reached the truck in an effort to help Green, he found the truck running and in neutral with the door closed. *Id.,*

**2.** All parties agree that Maryland law controls the case because all events occurred in Maryland.

Exhibit # 16 at 12–13. Ward additionally stated in his deposition that Green had his eyes open and his hand was moving. Id. Unfortunately, that did not last long and Ward was in no position to help Green.

Plaintiffs argue that summary judgment on the issue of contributory negligence is not proper for this Court to decide as a matter of law. Plaintiffs point out that the evidence presented to this Court does not clearly establish how the accident occurred. Therefore there are facts that are in dispute. Defendants acknowledge the uncertainty of the cause of the collision, but counter that although there are facts in dispute, those facts are not material facts. Plaintiffs present three plausible theories as to how the collision could have occurred based on the evidence presented. Plaintiffs believe that these theories do not involve any fault on the part of Mr. Green, and therefore, as a matter of law, there can be no contributory negligence. The first theory has Green working on the truck as it is parked in front of DIT. The access road at that point is sloped downward. Since, the truck was running and in neutral, the truck may have begun to roll down the road. Green, noticing the truck rolling, would have jumped into the cab in an attempt to stop the truck by applying the brake. Green then successfully stopped the truck by turning into the pole. Theory number two has Green pulling out into the access road as he leaves DIT. While he leaves, he experiences a heart attack, which although not fatal, was strong enough to render him momentarily incapacitated and unable to avoid the utility pole. As evidence of this theory, Plaintiffs have presented the testimony of Green's autopsy, which shows Green with an enlarged heart, blockage in his arteries, and some minor scaring of the heart tissue. Finally, the Plaintiffs' third theory has Green, again entering the access road in an attempt to turn the truck. Because of the time of the day, as well as the fact that it was a cloudless day, Green is temporarily blinded by the sunlight and does not see the utility pole, thus colliding with it.

## 1. The Rolling Truck Theory

The Court will analyze each of these theories individually, beginning with the theory that the truck was rolling down hill. This theory was suggested by the collision investigator, Officer Coda. Green regularly repaired his tractor trailer himself. Plaintiffs' Consolidated Opposition, Exhibit # 11 at pg. 10. Therefore, it would be plausible for Green to work on the brake lines of the truck while it was parked outside of DIT. Green had parked the truck on a slight downhill grade. Id., Exhibit # 27 at pg. 74. Additionally, when Ward ran to the truck after the impact, he found the truck running, and in neutral. Id., Exhibit # 26 at pgs. 17–18. The accident occurred roughly fifteen to twenty minutes after Green left DIT. Id., Exhibit # 10 at pg. 24. This would have been plenty of time for Green to begin working on his truck. Ward saw the truck traveling at a very low speed when it hit the pole. Id., at pgs. 17–18, 23. A truck of that weight, parked on a slight downhill grade, in neutral could very easily begin to roll, especially with the engine already running.

 Plaintiff is accurate in its assessment that the truck rolling down to the utility pole is a viable theory. However, under this scenario, Green would be negligent under Maryland law. As previously stated, contributory negligence is defined as "...the doing of something that a person of ordinary prudence would not do under the circumstances." *Menish* at 558, 356 A.2d 233. Green was an experienced truck driver, having driven large trucks for over 25 years. Plaintiffs' Consolidated Opposition, Exhibit # 21 at pg. 66, # 11 at pg. 12. He also was familiar with the area around DIT having been there a number of times to purchase parts for his truck. Furthermore, the store clerk stated in his deposition that there was nothing unusual about Green's behavior and he did not appear to

be in a hurry. Therefore, the evidence shows under the rolling truck theory that an experience truck driver, who was acting normally, worked on the brakes of his loaded tractor trailer, while the engine was running and the truck was in neutral, all the while parked on a slight downward slope. This is certainly not the act of an ordinarily prudent, experienced truck driver under these circumstances. If Mr. Green were alive to tell the Court that this is what happened, then as a matter of law, this Court would find Green contributorily negligent. Ordinary minds would not differ in declaring these actions to be negligent and the truck rolling towards the utility pole would be a foreseeable danger of Green's actions.

## 2. The Heart Attack Theory

The second Plaintiffs' theory has Green suffering an incapacitating heart attack while he was driving his tractor trailer. The heart attack, while not severe enough to kill Green, was strong enough to cause him to lose control of the truck and thus explaining why he hit the utility pole. Both parties have medical experts who cannot state with a reasonable degree of medical certainty that Green had a heart attack. However, both medical experts do state that a heart attack was a possibility. Plaintiffs' Consolidated Opposition, Exhibit # 29, at pgs. 62–64, 75–79; Exhibit # 31 at pgs. 77–78. The autopsy and the medical experts agree that the weight of the transformer pinned Green to the steering wheel, causing asphyxiation and his unfortunate death. However, the medical examination did produce evidence that Green could have suffered a heart attack.

Green had an enlarged heart, even for someone of his size and weight.[3] Green also had substantial blockage of his arteries and some scarring on his heart tissue. The scarring on the heart tissue is evidence of an old heart incident. However, if Green where to have a new heart incident, such as an attack, the body died so soon afterwards that there would not have been enough time for scar tissue to develop. Id., Exhibit # 31 at pg. 94. Because of his health condition, the heart attack could have just occurred or the heart attack could have been brought on by sudden exertion by Green. That sudden exertion could have been caused by Green working on his truck trying to repair the breaks outside of DIT or when Green was attempting to run into the truck if, in fact, it was rolling downhill on the access road. There is evidence to cast suspicion on the heart attack theory. The truck was found in neutral and the truck was running. This would still leave Green negligent for working on his truck, while parked on a slight decline with the engine running and the truck in neutral. If the heart attack occurred while Green was just driving, why would the truck be in neutral? The heart attack theory is the most speculative of the three theories.

 However, this is the Defendants' Motion for Summary Judgment, which means that at this stage of the proceedings, all facts must be viewed in a light most favorable to the Plaintiffs. There has been evidence presented to this Court that Green could have suffered a heart attack. Because of the condition of his health, the heart attack could have come at any time and for no other reason than he was heavy and had substantial blockage of his arteries. The attack could have come at the time when Green was just beginning to drive his truck out of the DIT lot. If this scenario is true, there is no evidence of contributory negligence by Mr. Green. Having a heart attack is a physical incapacity that Green could not control. Courts have ruled that a person is not negligent for having a heart attack. The only time that an individual is negligent in having a heart attack is if they have done something affirmative that would greatly increase their risk of having an attack; such as missing a critical doctor's appoint-

---

3. Mr. Green was 5'11" and weighted 257 pounds. Id., Exhibit # 30 at pg. 2.

ment, ignoring chest pains and other obvious signs, or engaging in activity which the individual has been warned could cause a heart attack. There has been no evidence offered that Mr. Green took some affirmative action to increase the likelihood of his having a heart attack.

### 3. The Blinding Sun Theory

The third and final Plaintiffs' theory, also put forth by Officer Coda, has the Plaintiff getting into his truck and attempting to leave the industrial park. Green starts the truck and begins to proceed onto the access road. As he is turning onto the road, Green is temporarily blinded by a setting sun, and not able to see the utility pole in front of him. There are ample facts to support such a conclusion. It was a cloudless day and at the time Green was turning onto the road, the sun would have been setting. It was around 5:00 p.m. in March. Office Coda stated in his deposition that from the height of a truck, facing straight at the pole, the sun is directly in the driver's line of sight. Id., Exhibit # 27 at pgs. 31, 34, 44–45. There is also evidence that Green drove by the utility pole on other occasions and never hit the pole before. All of the times that Green went to DIT to get parts for his truck, he never had a problem with the utility pole.

Plaintiffs' argument that Green's vision may have been impaired by the sun does not erase Green's potential contributory negligence. Courts have ruled conduct to be contributory negligence in cases where the person failed to observe something that a person exercising reasonable care would have seen. *Leakas, et. al. v. Columbia Country Club, et. al.,* 831 F.Supp. 1231, 1236 (D.Md.1993). In related type cases, plaintiffs in Maryland are almost always charged with the responsibility of knowing about electric wires that are within their plain view. *See Ramos v. Southern Maryland Electric Cooperative, Inc.,* 996 F.2d 52, 54 (4th Cir.1993); *Southern Maryland Electric Cooperative, Inc. v.*

*Blanchard,* 239 Md. 481, 212 A.2d 301 (1965); *Campbell v. Baltimore Gas and Electric Co.,* 95 Md.App. 86, 619 A.2d 213 (1993). The utility pole was a stationary object. It was in clear view of Mr. Green before he started proceeding onto the access road. Furthermore, Green had driven by the pole on the other occasions that he purchased truck parts at DIT. Temporary blindness caused by the sun is not a viable excuse to relieve Green of his duty to see unobstructed objects before him.

Additionally, whether or not Green was temporarily blinded by the sun is not a fact that is material to the accident. The Maryland courts dealt with this issue in *Liscombe v. Potomac Edison Company,* 303 Md. 619, 495 A.2d 838 (1985). In *Liscombe,* a dump truck operator brought suit for damages from an electric shock he received allegedly caused by defendants' gross negligence. In his deposition the plaintiff testified that he could not have seen the wires because the "sun was right there." *Id.* at 626, 495 A.2d 838. The court held that even if the sun condition existed, "plaintiff's actual knowledge of the presence of the wires and of the general danger inherent thereto required him to exercise reasonable care and caution increased to a degree commensurate with the greater danger." *Id.* at 627, 495 A.2d 838. Citing *Longenecker v. Zanghi,* 175 Md. 307, 313, 2 A.2d 20 (1938). Green had actual knowledge that the utility pole was on the side of the access road from his trips to DIT. Green, as a reasonable person, must have also known of the inherent dangers of colliding a tractor trailer with a load on its bed, into a utility pole. The suggestion that the sun's glare temporarily blinded Green does not materially impact the facts as known by the Court.

### C. Conclusion

The Plaintiffs have presented this Court with three plausible theories as to what happened to Mr. Green to cause him to hit the utility pole. As this Court has already stated, the question of contributory negli-

gence is usually reserved for the trier of fact, unless the act was "distinct, prominent and decisive, and one about which ordinary minds would not differ in declaring it to be negligent." This standard would characterize Green's actions under the rolling truck theory and the blinding sun theory. However, there is a question of fact as to whether Green had a heart attack while in the truck and if it caused his running into the utility pole. These are questions for a trier of fact to answer, and not for the Court at this stage of the proceedings. Therefore, the Court will deny Defendant PEPCO's Motion for Summary Judgment based on the fact that Green would not have been contributorily negligent if a trier of fact determines that he could have had a heart attack which caused him to lose control of the tractor trailer.

### III Statute of Repose

Defendant Reilly has filed a Motion for Summary Judgment in the present case. Reilly argues that the Plaintiffs' action is barred by Maryland's Statute of Repose on the grounds that the installation of the utility pole was an "improvement" to real property and that Green's accident occurred in 1996, 28 years after the pole was installed in 1968. This is the second time Reilly has brought this issue before the Court. As summarized in the Factual and Procedural Background section of this Memorandum Opinion, the Court denied Reilly's Motion for Judgment on the Pleadings on the Statute of Repose issue because the Court did not feel as if there was enough evidence to decide the matter. More specifically, the Court had questions about: (1) whether the utility pole and transformers were newly installed; (2) whether there had been electrical service on this property prior to the pole's installation; and (3) who or what entity owns, or owned the property when the pole was installed. With discovery complete in the case, the Court feels that it has the requisite information to render a decision.

### A. The Statute

Maryland's Statute of Repose, in pertinent part, deals with injuries sustained after the completion of an improvement to realty by stating:

> [n]o cause of action for damages accrues and a person may not seek contribution or indemnity for damages incurred when wrongful death, personal injury, or injury to real or personal property resulting from the defective and unsafe condition of an improvement to real property occurs more than 20 years after the date the entire improvement first becomes available for its intended use.

Md.Code Ann., Courts and Judicial Procedure § 5–108(a). Furthermore, "A cause of action for an injury described in this section accrues when the injury or damage occurs." Id. at § 5–108(e). The utility pole was manufactured by Republic Creosoting, now Defendant Reilly Industries, Inc., and installed in its current position by Defendant PEPCO in 1968. Defendant Reilly Industries, Inc. Motion for Summary Judgment, Exhibit C at pgs. 110–112. On its face, Reilly appears to have met the first prong of the Statute of Repose criteria by the pole having been in place for approximately 28 years. What the Court must determine is whether the placing of the utility pole on the property is considered an "improvement" under Maryland law. If the utility pole is considered an improvement, than Defendant Reilly will be protected under the Statute of Repose.

### B. The *Rose/Allentown* cases

In aiding this Court on a definition of an "improvement," the *Rose*[4] and *Allentown*[5] cases provide the most guidance in determining the status of the utility pole. As

**4.** *Rose v. Fox Pool*, 335 Md. 351, 643 A.2d 906 (1994)

**5.** *Allentown Plaza v. Suburban Propane Gas Corporation*, 43 Md.App. 337, 405 A.2d 326 (1979).

summarized in the Court's September 2, 1999 Memorandum Opinion, the *Rose* case dealt with a residential swimming pool and whether that was considered an improvement to real property. The *Allentown* case dealt with a temporary gas meter and whether it was an improvement. In *Allentown*, the Maryland Court of Special Appeals adopted a "common-sense approach," in defining improvements to real property. "Improvement" was defined to include "everything that permanently enhances the value of premises for general uses." *Allentown* at 345, 405 A.2d 326. The Maryland Court of Appeals in the *Rose* case, used the "common-sense approach," as well in determining whether something is an improvement or not, including a reliance on "...whether the object is an improvement within the common, dictionary meaning of that term." *Rose* at 376, 643 A.2d 906.[6] The definition that the *Rose* court chose to use was the definition of "improvement" found in Black's Law Dictionary. *Rose*'s definition of improvement was a narrower definition than the one the *Allentown* court gave. Black's Law Dictionary defines improvement as:

> [a] valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes. Generally has reference to buildings, but may also include any permanent structure or other development, such as a street, sidewalks, sewers, utilities, etc. An expenditure to extend the useful life of an asset or to improve its performance over that of the original asset. Such expenditures are capitalized as part of the asset's cost.

*Id.* Citing Black's Law Dictionary (6th ed.1990). The *Rose* court also considered the nature of the improvement, its perma-

nence and relationship to the land and its occupants, and its effect on the value and use of the property. *Rose* at 377, 643 A.2d 906. This formula for determining whether a change to property is an "improvement to real property," has been adopted by the United States District Court for Maryland. *Lewis v. Weldotron Corp.*, 61 F.Supp.2d 435, 437 (D.Md.1999). In *Lewis*, the court opined that in order to determine the status of an improvement, the court should "consider the nature of the addition or betterment, its permanence and relationship to the land and its occupants, and its effect on value and use of property." *Id.*

## C. Is the Utility Pole an "Improvement?"

Some background on the utility pole in question and the ownership of the property will be helpful in determining the status of the utility pole. In 1967, PEPCO ordered the utility pole from the pole manufacturing division of Reilly (then operating under the name Republic Creosoting Company.) Plaintiffs' Opposition to Defendant Reilly's Motion for Summary Judgment, Exhibit # 1 at nos. 1,4; Exhibit # 2 at pgs. 75–76. The pole was part of PEPCO's effort to provide electricity to the Willard's warehouse which was located on the adjacent parcel of land. The utility pole, originally, did not provide electricity to the property on which it sat. At the time, the parcel of property in question was owned by a Mr. Adams. *Id.*, Exhibit # 9 at pgs. 113–14; Exhibit # 10 at pgs. 9–10. After 1968, when the pole was installed, Mr. Adams sold the property to Richard Kimmel. In either 1979 or 1980, Mr. Kimmel developed the property, building a warehouse and office space. *Id.* at 94. Some time in the 1980's the Salkelds, who also owned the Willard Packaging Company property, purchased a 25 foot right of way

---

**6.** A minority of courts have adopted and relied upon the common law fixture analysis. This analysis takes into consideration the degree of annexation and the physical size of the object to determine whether a particular object qualifies as an "improvement to real property."

on the parcel, which included the utility pole, to pave an access road to their warehouse. At that point, the utility pole was used to supply power to the parcel of land in which it was attached. In 1989 the Salkelds, purchased the remainder of the property from Mr. Kimmel. With discovery complete, the Court's previous three questions can now be answered. The utility pole was newly installed in 1968. Three 25 KVA transformers were attached to the utility pole at that time. Id., Exhibit # 6 at pgs. 233–234. Because of an increase in power usage, the transformers were replaced in 1987 by three 50 KVA transformers which are larger and heavier than the previous transformers on the utility pole. Id. There had been no electrical service on the property, or on the Willard Packaging Company's property until the utility pole was installed in 1968. Finally, the property was owned by a Mr. Adams at the time the pole was installed, and the property has changed hands a couple of times since then.

■ Plaintiffs, and Defendants Asplundh and PEPCO all oppose Reilly's motion. Both Defendants Asplundh and PEPCO believe that the utility pole is not an improvement to real property under the Statute of Repose. The Defendants point to the fact that the pole is not a permanent fixture to the property and that the pole did not start serving the property until 1989, only seven years before the accident. Plaintiffs reiterate those same arguments and additionally raise the points that PEPCO owed and controlled the pole, not Reilly. Plaintiffs also believe that the pole was not needed to provide electricity to the property, that could have been done by underground wiring. Furthermore, the owners, the Salkelds do not care whether the parcel that has the pole on it, has electricity. Plaintiffs conclude that the utility pole actually decreases the value of the property. Despite the arguments presented to the contrary, this Court finds that under the *Rose/Allentown/Lewis* line of cases, the utility pole is an "improve-

ment to real property" under the Maryland Statute of Repose.

The *Rose* court instructs us to look at the common, dictionary meaning of the term "improvement." Within the Black's Law Dictionary definition of "improvement" is included the phrase, "Generally has reference to buildings, but may also include any permanent structure or *other development*, such as a street, sidewalks, sewers, *utilities*, etc." *Black's Law Dictionary* (6th ed.1990) (emphasis added). The utility pole is practically in Black's Law Dictionary as an improvement to real property. The utility pole also meets the standard laid out in the *Lewis* case. A betterment is defined by Black's Law Dictionary as:

"An improvement put upon a property which enhances its value more than mere replacement, maintenance, or repairs. The improvement may be either *temporary* or permanent. Also applied to denote the additional value which a property acquires in some consequence of some public improvement, as laying out or widening a street."

Black's Law Dictionary, pg. 161 (6th ed.1990) (emphasis added). The utility pole is the same as a public improvement mentioned in the definition. It is more than just replacing a structure on the property, or maintaining and repairing an already existing structure. Although a utility pole can be removed from the ground in roughly 15 minutes, that is not the only determination of its relationship with the parcel in question. The pole has been in the same spot for 26 years. This includes all of the weathering that has been inflicted upon the utility pole. Even after the accident, PEPCO, once again erected a pole in the same exact position. This reflects a relationship that the utility pole has with the land. The pole has also survived three different owners, which shows a desire to keep the pole on the property, as well as a sense that the pole runs with the land. The mobility of the utility pole is not the only determination of perma-

nence. Otherwise, an improvement would be defined by using a fixture argument, which this Court and the Maryland Courts have rejected.

The utility pole's value and use to the property are important as well. Plaintiffs are correct that PEPCO is required by law to provide electricity to whomever requests it. However, the property already comes with electricity, so there. is no time and labor involved in getting the electricity set up. If the pole decreased the value of the property, as the Plaintiffs assert, then why would a developer purchase the property, with the pole on its grounds, and develop office space. The pole did not dissuade the Salkelds from purchasing a 25 foot strip of the property, with the pole on the strip, in order to have a driveway to their warehouse. The oppositions' argument that the pole was not benefitting the property for twenty years must also fail. The utility pole was providing electricity on the property in which it sat since the 1980's when the Salkelds purchased the 25 foot strip of the parcel, which included the pole, for a driveway to their warehouse. Although that is less than twenty years, the pole has been on the property for 26 years until the accident. While the pole might not have been directly providing electricity to its parcel, it was a structure, already in place, which could easily provide electricity when the property was developed as it does now. In *Lewis,* the shrink wrap machine (the improvement in question) was installed in 1969 and ran until the company closed in 1980. The machine did not start running again until 1986. The court did not subtract the six years in which the machine was present on the property, but was not in use. The Court, in this case, will not subtract the years in which the pole was not providing electricity for the parcel in question. Since 1968, the utility pole was operational, and it was the owners choice to not use the pole to provide electricity to the land in which it sat upon.

### D. Conclusion

The Court finds that the utility pole is an improvement to real property as stated under the Maryland Statute of Repose. The pole sat on the property for 28 years, surviving all types of weather and numerous thaws and frosts. When the pole was damaged in the accident, a new one was put right in its place. The pole first provided electricity to the neighboring Willard property and allowed the owners of the parcel in question to access electricity through the pole. The land, pole and all, was sold twice, and even developed despite the pole's position. Finally, the pole provided an important benefit to the owners of its property, and the adjoining property. Electricity could have been delivered in other ways, but that was the way that was chosen by PEPCO with out any complaints from any of the property owners. Because the utility pole is an "improvement to real property" under § 5-108, and has been in the same spot for 28 years, the Maryland Statute of Repose applies. Therefore, Defendant Reilly's Motion for Summary Judgment will be granted from this case, and they are dismissed entirely from the present action.

### IV Defendant Asplundh's Motion for Summary Judgment as to Counts I, II, III, and IV.

Defendant Asplundh brings a Motion for Summary Judgment as to counts I, II, III, and IV alleging that Plaintiffs have not submitted to this Court evidence that they had a duty to Plaintiffs, and that the Defendant was the proximate cause of Mr. Green's death. Plaintiffs raise the issue that Asplundh, as well as all of the Defendants, should have foreseen that the utility pole, in its position was dangerous. Maryland law is clear on this issue. "If a pole has existed at a relatively unchanged site for any significant length of time without serious problems, there may be little reason to anticipate a future collision, for it suggests that motorists are able to navigate that part of the road without inci-

dent." *Coates v. Southern Maryland Electric Cooperative, Inc.,* 354 Md. 499, 523, 731 A.2d 931 (1999). The facts are clear on this point. The utility pole has been siting, unchanged, in the same spot for 28 years. Originally, the pole was put on a dirt access road that was later paved over. Until Green hit the utility pole, there has been no clear evidence presented to this Court that any of the trucks that drove by the pole on a daily basis to get to Willard Packaging, ever struck the particular pole in question.[7] The vehicles that passed by the pole are tractor trailers, which are much larger and harder to maneuver than automobiles, and still, not an accident in 28 years. Plaintiffs even offered evidence that the decedent passed by the utility pole on a number of occasions when purchasing parts from DIT. This Court has been presented with no evidence that would show it is foreseeable that Green could have hit the pole on his own.

█ The Plaintiffs also have difficulty convincing this Court that all of the elements of negligence have been met in the instant case. To establish a cause of action of negligence in Maryland, a plaintiff must show duty, breach, causation, and damages. *Jacques v. First National Bank of Maryland,* 307 Md. 527, 531, 515 A.2d 756 (1986). As discussed above, Asplundh's duty does not result in the foreseeability of a truck striking the pole. The only duty that can be established by Plaintiffs is that Asplundh created a duty to inspect the pole when it contracted with PEPCO. In 1989, Asplundh contracted with PEPCO to inspect the utility poles for decay damage at the street level of the pole. Asplundh's only inspection of the pole occurred on November 22, 1989, over six years prior to the accident. Around 1993 or 1994, the contract between Asplundh and PEPCO expired and PEPCO contracted with another company to in-

spect its Montgomery County utility poles. The contract specified that Asplundh was liable for:

"F. The above groundline inspection will include, but not to be limited to the following:

1. Each pole shall be visually inspected, from the ground, for broken cross arms, woodpecker holes, lightning damaged hardware, broken pins, broken insulators, hazardous cattle guards, poles with excessive lean, wire off of insulators, stencil off pole, wrong stencil number on pole, frayed guy ends at the ground, foreign objects (such as basketball hoops) on pole, and all other unsafe conditions."

Defendant Asplundh's Motion for Summary Judgment, Exhibit # 8 at pg. 8. The contract specifically states that the poles are to be inspected from the ground. It would be hard for the typical Asplundh working to view a cluster of knots in the pole 22' 8" up in the air. However, there was evidence presented that Asplundh workers typically use binoculars to aid them in their inspection of the poles. It is unclear whether a cluster of knots could be seen by using binoculars. Because there is a question as to whether the inspection would have revealed a problem in the utility pole, the Court will view the facts in the light most favorable to the Plaintiffs and conclude that the contract between PEPCO and Asplundh, created a duty for Asplundh to inspect the utility pole, even for the knot cluster. Asplundh breached that duty by not discovering and reporting the knot cluster to PEPCO immediately.

█ However, just because Asplundh potentially breached their duty to inspect the pole, does not mean that they are negligent. The breach of duty must be the proximate cause of the injury. *Bell v. Heitkamp, Inc.,* 126 Md.App. 211, 222, 728 A.2d 743 (1999). A determination of proximate cause requires an examination

7. The pole's guy wire was struck by a trailer in 1993. The trailer was delivering newspapers and had never been to the property before. A guy wire, while attached to the top of the pole, is thin and light in color, thereby making it harder to see than the actual utility pole.

of two elements; 1) cause in fact, and 2) legally cognizable cause. *Wankel v. A & B Contractors, Inc.,* 127 Md.App. 128, 732 A.2d 333, 349 (1999). There are two tests used in Maryland to determine whether cause in fact exists: the "but for" test and the "substantial factor" test. *Id.* The "substantial factor" test is pertinent for the above captioned case. The test for determining whether Asplundh's actions were the "substantial factor" in the transformer falling on Mr. Green include: 1) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it, 2) whether the actor's conduct has created a force or forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible, and 3) lapse of time. *Peterson v. Underwood,* 258 Md. 9, 18, 264 A.2d 851 (1970) (Citing Restatement of Torts, Section 433). There are just to many intervening factors that occurred in the six years from the inspection to the accident, for Asplundh to be negligent to the Plaintiffs. Most telling is in 1993, when a tractor allegedly hit a guy wire that helped to support the utility pole. Eyewitnesses testified that when the guy wire was struck, "the pole was twisted facing east pretty much, and the transformers were dangling, and they were just swaying, and they were moving about 2 feet." Plaintiffs' Opposition to Defendant PEPCO's Motion for Summary Judgment on the Absence of Duty or Breach of any Duty at Exhibit # 12 at pgs. 23–24. The PEPCO employee went up the pole with a mechanical lifter to replace some fuses (the power had gone out). Id., at pg. 28. PEPCO made a determination that a new guy wire, which helps to support the utility pole and transformers, was not needed. Id., at pgs. 28–29. Furthermore, outside of PEPCO's decision at that time to not replace the guy wire, they were under a much better position to determine if the knot cluster was a potential problem or not. PEPCO's inspection was much more complete than Asplundh's ground level in-

spection of the utility pole. Finally, it was Green's truck hitting the pole that caused the pole to break and the transformer to fall. There are just too many other parties that are equally, if not more culpable for the transformer falling for Asplundh's alleged breach of their duty to inspect to be the proximate cause of Green's untimely death. Because Plaintiffs have not set out all of the elements of a claim of negligence or gross negligence against Defendant Asplundh, this Court will grant Defendant's Motion for Summary Judgment as to counts I, II, III, and IV and dismiss them from the case.

## V Defendant PEPCO's Motion for Summary Judgment on the Absence of Duty or Breach of any Duty.

Defendant PEPCO brings the following Motion for Summary Judgment, arguing that they owe no duty to Plaintiffs in the instant case. Although, both parties raise a number of issue in arguing this motion, the Court does not need to look any further than PEPCO's duty to inspect and maintain the utility pole.

The record before the Court contains conflicting allegations and evidence as to whether the Defendants knew the pole was in a dangerous location, that the pole had been hit by a number of trucks, and what duty, as a holder of a right of way, does PEPCO owe to Mr. Green. What is clear to this Court, however, is that sometime in 1993, a truck hit a guy wire which was attached from the ground to the top of the utility pole. When the guy wire snapped, eyewitnesses have stated in their depositions that the pole appeared to be twisted and swaying. Furthermore, the transformers seemed to be separated from the utility pole. PEPCO, and PEPCO only, came out the utility pole after the 1993 incident to inspect the pole. Their inspection failed to discover the potentially dangerous knot cluster, which was located right at the point where the pole would split when hit in 1996 by Green. Additionally, PEPCO, and PEPCO only, made the determination that the guy wire, which helps to support the pole and the trans-

formers, did not need to be replaced. The PEPCO employee who inspected the pole after the 1993 incident was told that when the guy wire snapped, the utility pole swayed back and forth. Plaintiffs' Opposition, Exhibit # 12 at pgs. 25–27.

Defendant PEPCO argues that Green was a trespasser on Willard's property. The owner of property, and, as PEPCO contends, the owner of a right of way easement on real property, owes a trespasser the duty to "refrain from willfully or wantonly injuring or entrapping the person 'once his presence is known.'" *Mech v. Hearst Corp.*, 64 Md.App. 422, 426, 496 A.2d 1099 (1985). Without deciding the merits of whether Green was a trespasser or was owed a higher duty, this Court believes that evidence has been presented by Plaintiffs for a trier of fact to reasonably decide that PEPCO's actions were willful and wanton. PEPCO's inspector was told that the utility pole was swaying after the guy wire had snapped. Furthermore, they were told that the three 500 pound transformers atop the pole had separated from the pole. PEPCO was also told that trucks passed by the pole on a regular basis and a picnic area was in plain view of the utility pole area. There is certainly enough evidence present in the case to show that PEPCO should have known that the utility pole was dangerous and that there was vehicular and pedestrian traffic in the area. A trier of fact could reasonably determine that PEPCO could have anticipated a 500 pound transformer dropping in an area where people may be. PEPCO's Motion for Summary Judgment will be denied by this Court because a trier of fact could reasonably determine that PEPCO owed Plaintiffs a duty, and they breached that duty.

## VI Defendant PEPCO's Motion for Partial Summary Judgment on Damages Resulting from Conscious Pain and Suffering

Plaintiffs seek to recover conscious pain and suffering damages under their survival action claims. In Maryland, plaintiffs can recover pain and suffering damages endured by the deceased, between the time of injury and the time of death. *Beynon v. Montgomery Cablevision Limited Partnership*, 351 Md. 460, 475, 718 A.2d 1161 (1998). In order to recover for conscious pain and suffering, the defendant's negligence must be the direct and proximate cause of the accident, the victim must have lived after the accident, and the victim must have suffered conscious pain. *Tri–State Poultry Cooperative v. Carey*, 190 Md. 116, 125, 57 A.2d 812 (1948). Defendant PEPCO, while not conceding that their alleged negligence was the direct and proximate cause of the accident, argues that if Plaintiff lived after the accident, it was for a short time. Plaintiffs' medical expert, as stated earlier in this Memorandum Opinion, stated in his deposition that the deceased could have reasonably lived for four to six minutes before he died. Furthermore, there is the testimony of Mr. Ward who saw the decedent immediately after the accident and stated in his deposition that Mr. Green's eyes were open, and they appeared to be looking at him. Furthermore, Ward stated that he saw Green's hand moving. Sufficient evidence has been presented to this Court that would allow a trier of fact to reasonable find that Green did not die instantaneously and that he suffered for the brief time before he died. Defendant's argument that four to six minutes is too brief a time to recover pain and suffering is without merit. The Court in *Tri–State*, held that recovery may be had although the period between accident and death is short. *Tri–State* at 125, 57 A.2d 812. It will be up to the trier of fact to determine whether Green was conscious at all after the accident and how much did he suffer. Accordingly, the Court will deny Defendant PEPCO's Motion for Partial Summary Judgment on Damages Resulting from Conscious Pain and Suffering.

## VII Third Party Defendants Salkeld and Willard Packaging Company's Motion for Summary Judgment.

Defendant PEPCO has filed a third party action against Salkeld and Willard

Packaging Company alleging that the third party Defendants owed a duty to PEPCO to inspect and maintain the property and the utility pole and to warn PEPCO of any dangerous condition. Third party Defendants have been brought into this action, in essence, to contribute to PEPCO if they are found liable to Plaintiff Green. Plaintiffs have not brought a direct claim against Salkeld and Willard Packaging Company. The Court will grant third party Defendants Salkeld and Willard Packaging Company's Motion for Summary Judgment.

PEPCO contends that third party Defendants owed them a duty because they were a business invitee on Willard's property. Therefore, third party Defendants should have warned PEPCO about the known hidden dangers in the utility pole and against all foreseeable dangers. Additionally, PEPCO argues that the third party Defendants were in a superior position to inspect and maintain the pole because Willard employees drove by the pole on a daily basis. As stated earlier in the Court's Memorandum Opinion, the pole was placed on the parcel in 1968 by PEPCO, before Willard owned the property. Willard did not own the property on which the pole stood until sometime in the 1980's. At that point, Willard owned a 25 foot right of way and paved the area around the utility pole to create an access road. Finally, in 1989, the third party Defendants purchased the entire lot on which the pole stood.

 PEPCO received a right of way easement from the owners of the parcel in order to place the utility pole in its current place. The easement amounts to a nonpossessory interest in the parcel of land where the pole was placed. *Boucher v. Boyer*, 301 Md. 679, 688, 484 A.2d 630 (1984). Under the right of way easement, PEPCO had the right to "prepare, maintain, improve or repair" the utility pole at anytime. *Fedder v. Component Structures Corp.*, 23 Md.App. 375, 381, 329 A.2d 56 (1974). If PEPCO wanted to, they could

have moved the utility pole to a different location in the parking lot. PEPCO's argument that the third party Defendants were in a superior position to know about hidden dangers in the pole is without merit. PEPCO originally installed the pole in 1968 and had every opportunity to inspect the pole for the knot cluster where the pole eventually split apart. PEPCO also made a unilateral decision in 1987 to replace the three 25KVA transformers, with three 50 KVA transformers. When one of the transformers was not working properly in 1988, PEPCO came out and replace it with another 50 KVA transformer. PEPCO regularly contracted out to companies to visually inspect the utility poles for decay and other problems. Such companies as Defendant Asplundh and others would write inspection reports for PEPCO on the utility poles. In 1993, when a tractor collided with a guy wire on the pole, PEPCO came out and inspected, once again, the pole, and made the determination that a new guy wire was not needed. Additionally, employees from the area told the PEPCO employee about the condition of the pole after the guy wire snapped. PEPCO had intimate knowledge of the utility pole. Third party Defendants could not have had the type of knowledge about the pole that PEPCO had from just their employees driving by the utility pole on a daily basis. Even if they could have, there has been no evidence presented to this Court that there was a change in the pole from the 1993 incident to the 1996 accident with Mr. Green. Therefore, PEPCO at the very least, knew everything that third party Defendants knew about the pole.

 The Court will grant third party Defendants Motion for Summary Judgment. PEPCO had a right of way easement on the parcel of land that began before Willard Packaging Company owned the property. The only change made to the property was where the land was paved around the utility pole, a condition PEPCO was aware of as early as 1989 from Asplundh's inspection, and possibly

earlier. PEPCO had a right to prepare, maintain, improve or repair the utility pole as it desired and did so on a number of occasions between 1968 and 1993. Furthermore, PEPCO had superior knowledge of the condition and stability of the utility pole. It was PEPCO who made the affirmative decision to not install a new guy wire, which, a trier of fact could reasonably determine made the pole less stable. PEPCO was owed no duty by third party Defendants Salkeld and Willard Packaging Company. Finally, under Maryland law, the right of contribution must arise from the duty each of the alleged tort-feasors owes to Mr. Green and not from any potential obligations that Defendants Salkeld and Willard Packaging Company owed PEPCO. *Fischbach & Moore Intern. Corp. v. Crane Barge R 14*, 632 F.2d 1123 (4th Cir.1980). Defendant PEPCO has not offered this Court any evidence of duty that Salkeld and Willard owed Mr. Green and Plaintiffs have not included the third party Defendants in their complaint.

## CONCLUSION

For the foregoing reasons the Court will deny Defendant PEPCO's Motion for Summary Judgment on the Issue of Contributory Negligence. The trier of fact could reasonable decide that Mr. Green had a heart attack while he was driving the truck. If that is the case, then there can be no contributory negligence on the part of the deceased. The Court will grant Defendant Reilly's Motion for Summary Judgment on the issue of the Statute of Repose. The utility pole is an "improvement to real property" under Maryland case law and the pole has been on the land for 28 years. Additionally, the Court will grant Defendant Asplundh's Motion for Summary Judgment as to counts I, II, III and IV. Plaintiffs have failed to make out a case of negligence and gross negligence against Asplundh because they have not shown that Asplundh's actions were the proximate cause of Green's death. Defendant PEPCO's Motion for Summary Judgment on the Absence of Duty or

Breach of any Duty will be denied by this Court, along with their Motion for Partial Summary Judgment on Damages Resulting from Conscious Pain and Suffering. A trier of fact could reasonably determine that PEPCO owed a duty to Green and breached that duty. Furthermore, Maryland courts recognize damages resulting from conscious pain and suffering. Plaintiffs have submitted sufficient evidence to bring that question before the trier of fact. As for third party Defendant Salkeld and Willard Packaging Company's Motion for Summary Judgment, the Court will grant the motion. Willard did not owe a duty to PEPCO as a business invitee. Defendant Asplundh's Motion to Bifurcate and Motion to Exclude the Expert Testimony of Wallace O. Faison are moot as they have been dismissed as a party pursuant to the Court's granting of their Motion for Summary Judgment.

The Court will also, *sua sponte*, dismiss: (1) Defendant Reilly's cross-claim against PEPCO and Asplundh; (2) Defendant Asplundh's cross-claim against Reilly; (3) Asplundh's cross-claim against PEPCO; (4) Asplundh's cross-claim against Salkeld; and (5) Defendant Reilly's cross-claim against Salkeld. The basis for all five of the cross-claims are contribution and indemnification if Plaintiffs prevailed in their claims against Defendants. As stated previously by the Court, any right of contribution must steam from the duty alleged tort-feasors owe the Plaintiffs in this case. Defendants Asplundh, Salkeld and Reilly have all been dismissed as Defendants in the case, in part, because they owed no duty to the Plaintiffs for the alleged accident. Therefore, there is no basis for a claim based on contribution and indemnification.

All six counts of the Plaintiffs' complaint, sounding in negligence, gross negligence, and strict liability remain against Defendant PEPCO, only. All other parties are dismissed from the above cap-

tioned matter. A separate Order consistent with this opinion will follow.