TRI-STATE POULTRY COOPERATIVE, INC. ET AL. *v.* CAREY, ADMINISTRATRIX

[No. 97, October Term, 1947.]

*Decided March 17, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Fred W. C. Webb,* with whom were *E. Dale Adkins* and *V. Calvin Trice* on the brief, for the appellants.

*Stanley G. Robins,* with whom was *Emerson C. Harrington* on the brief, for the appellee.

GRASON, J., delivered the opinion of the Court.

The appellants (defendants below) appeal from a judgment entered in the Circuit Court for Dorchester County against them in favor of Sula H. Carey, administratrix of Orrick J. Carey, deceased, (plaintiff below).

The corporate appellant is engaged in business at Salisbury, Maryland. It employs a number of people who live some dstance from that city. The individual appellant, Charles Norman White, is employed by the corporate appellant.

On May 31, 1946, White, driving a bus belonging to the corporate appellant, drove a number of its employees to their respective homes, at the conclusion of the day's work. After returning these people to their homes, he was returning to Salisbury from Mt. Vernon when the accident, out of which this case arose, happened. White was traveling westerly on the Mt. Vernon Road. That road intersects a State highway, which runs north and south. It is a boulevard. At the northwest corner of this intersection there is a filling station, which faces east. Parked at the southwest corner of the intersection, on the Mt. Vernon Road, was a car belonging to a colored man by the name of Burke. As White approached this intersection the bus made an arc, running from the south side of Mt. Vernon Road, across the road, and came to rest at the side of the filling station. At the time Orrick J. Carey, the deceased, was about to get on his bicycle to return home. He worked at the filling station. As this bus, driven by White, swung across the Mt. Vernon Road, it struck Carey.

Witnesses to the accident immediately ran over to Carey. He was injured at the base of his skull and bleeding from the mouth. He was immediately lifted into

Burke's car and taken to Dr. Whaley, in Princess Anne, which is about a mile from the scene of the accident. He was put on the back seat of the car and Mr. Muir sat on the seat with him. As he was lifted into the car Carey "moaned and groaned" and his "Adam's Apple moved up and down". When they arrived at Dr. Whaley's office the doctor came out to the car. Carey was slumped down in the seat, and in order to examine him Dr. Whaley and Mr. Muir lifted him up, and Carey "moaned and groaned". The doctor admnistered morphine and ordered him to be immediately taken to the hospital at Salisbury. On the road to Salisbury Carey made no sound. He died about half past ten o'clock that night.

This suit was instituted by the personal representative of Carey to recover for funeral expenses and the pain and suffering he endured from the time of the accident until his death. Code 1939, art. 93, sec. 109.

Dr. Whaley testified: "Mr. Carey was in a slouched position on the back seat of Mr. Muir's car, and he was moaning. We pulled him up to get him in what I thought would be a better position, more in a sitting position, so as to have his head elevated. * * * When we would move him he did considerable groaning, and I administered some morphine to him and sent him immediately to the hospital." When asked if Carey, at that time, "was conscious to such a degree that he was suffering pain?", he answered: "I would say yes. I don't think he was totally conscious. He did not answer his name. But I do think he was conscious enough to elicit pain." The doctor stated that he administered morphine "for pain and to prevent shock". This examination of Carey by Dr. Whaley was made around 9 p. m. About forty-five minutes later he saw him at the hospital, and Carey died "as a result of these injuries". He further stated: "It was my conclusion that he had a fractured skull and fractured ribs". On cross-examination the doctor said: "I think he was bleeding from his ear" and "usually with a fractured skull you have bruises and contusions of the brain" and "a brain injury tends to

produce unconsciousness". He further testified that the fact a man is groaning doesn't necessarily mean he is conscious. He was asked: "You don't mean to tell this Jury definitely and positively that Mr. Carey was conscious at the time you saw him, do you? A. Well, I felt that in the process of helping Mr. Carey up he gave out more groans and so forth, I thought probably he was conscious to more pain. That was my reason for saying he was conscious of some pain. Q. But you have already told me the eliciting of those groans did not necessarily carry with it consciousness? A. No, sir; you can hear people groan that are totally unconscious."

Herbert A. Holland, Jr., operated a filling station at the corner opposite the filling station at which Carey worked. He said he heard the roar of the motor of the bus that White operated. He was standing outside of his filling station and saw the bus. He stated: "The truck evidently couldn't stop for some reason. * * * He made this left turn up into the filling station and hit Mr. Carey, * * *" who "was standing in front of the doorway in front of the filling station, just off of the concrete sidewalk." He said the filling station faced "toward Route 13", which runs from Princess Anne to Salisbury. As soon as Mr. Carey was hit the witness "ran across there to him". Carey was "laying flat on his back with the bicycle on top of him". He helped to put Carey in Burke's car and said Carey was "moaning and groaning". "Q. What about choking or blood running from his mouth? A. Yes, sir. Q. Tell the jury what you observed there? A. Seemed like his Adam's Apple was jumping up and down, and blood was coming out of his mouth." He further testified that he did not hear Carey say anything, and he did not know whether he was conscious or unconscious.

Douglas Simpkins, Jr. testified that he saw the accident, and said: "He (Carey) was moaning quite a bit while we were handling him".

Edward B. Muir testified he lives near the intersection and knew Mr. Carey. He got to the scene of the accident when they had Mr. Carey in the car and "Mr. Simpkins and I completed putting him in the car— placing him in the car, rather. * * * He moaned and groaned. * * * He groaned more when he was handled." After Carey was administered morphine by Dr. Whaley the witness did not hear any more moaning and groaning from him. Carey did not speak after the accident. Mr. Muir thinks that they arrived at the hospital between thirty and thirty-five minutes after they left the scene of the accident.

It is admitted that White was the agent of the corporate appellant and was in the course of his employment by it at the time the accident involved in this case occurred. At the trial of the case the only question argued by the attorney for the appellants was whether Carey suffered conscious pain from the time of the accident until he died. The question of primary negligence was not argued, and we take it that it was abandoned by the appellants. We will not, therefore, discuss that question, except to say that after a study of the record we are of opinion that there was legally sufficient evidence to justify the submission of the question of primary negligence to the jury.

The appellants contend: 1. That there was no legally sufficient evidence to show that Carey suffered conscious pain from the time that he was injured (about 9 p. m.) until he died (at 10:45 p. m.), to submit to the jury. 2. That Carey was mortally injured, and that any pain he suffered was incident to dying, and that a rule stated by the Supreme Court in Cases arising out of the Federal Employers' Liability Act, 45 U. S. C. A. § 51 et seq., should be adopted by this court.

On the first point we will consider the cases to which we have been referred.

In *Royal Indemnity Co. v. Pittsfield Electric Co.*, 293 Mass. 4, 199 N. E. 69, 71, the court said: "Continuance of life after a personal injury, though not continuance

of consciousness, is necessary to the existence and survival of a cause of action for the injury; but to permit the assessment of damages for bodily mutilation or physical or mental suffering there must have been pain or at least consciousness of injury. * * * A very brief period of life between injury and death will enable the cause of action to accrue and therefore to survive, and will give time for conscious suffering for which damages may be assessed. * * * This court has never adopted the doctrine that a dying man can acquire no right to. damages for the suffering which is incidental to his death."

In that case the deceased was electrocuted. He uttered a scream or two cries about a second apart. The court said: "We do not think that common knowledge would enable a jury to say * * * that the sound indicated the continuance of life or conscious suffering, rather than the mechanical expulsion of air by spasmodic muscular contraction caused by the shock." Recovery was denied in that case.

In *Melnik v. Perwak,* 295 Mass. 512, 4 N. E. 2d 329, the medical examiner testified that there was no conscious suffering. There was no recovery.

In *Covell v. Colburn,* et al., 308 Mich. 240, 13 N. W. 2d 275, 276, "The doctor who attended her (the deceased) and who was called as a witness by plaintiff stated that decedent suffered a cerebral concussion which immediately rendered her unconscious of pain; that she did not recover consciousness prior to her death thirty-three hours later."

It was the doctor's opinion that "even though the child might have spoken a word and moaned and groaned several hours prior to death, it was all due to reflexes and did not indicate consciousness."

In *Battany v. Wall,* 232 Mass. 138, 122 N.E. 168, the only evidence of conscious pain was that the child uttered, "Oh, Mama". The case was permitted to go to the jury.

In *Brosnan v. Gage,* 240 Mass. 113, 133 N.E. 622, 623, a boy broke through thin ice while skating. "After the intestate went through the ice he tried, and failed, to break a way through the thin ice to the thick ice for a minute or two, then sank, and was seen alive no more." That case was taken from the jury and reversed by the higher court.

The case of *Fulton v. Edison Electric Illuminating Co.,* 303 Mass. 258, 21 N.E.2d 609, 613, was a case of death resulting from an electric shock, and the victim died apparently within a matter of seconds after receiving the charge of electric current through his body. The court said: "We think that the evidence justified a finding that Fulton suffered consciously. There was testimony of a witness that she came out of the house at the northwest corner of Lakewood Road and Lake Avenue, before Fulton's body had been removed from the pole, and heard moans and groans; that the groans continued for seven minutes or more and she saw him 'wiggle for four or five seconds'; that she went back into the house and came out again, and then heard moans and groans, and 'observed movement in the plaintiff's intestate both times she came out'. It appeared that the moans were heard at a distance of one hundred fifty feet. There was testimony from a physician that in his opinion if Fulton 'wiggled and groaned for four or five seconds', he suffered consciously, and that 'if the groans continued over a longer period then he consciously suffered longer; that if the groans were heard one hundred fifty to two hundred feet away they would be more than the mere breaking down of respiration and that circulation still continues in the body although there is no pulse'; that noise from the mere expulsion of air from the lungs would not be heard for more than one hundred feet; and that 'in the plaintiff's intestate we know from the hemorrhages that there was a certain amount of circulation going on and therefore stoppage of circulation in the brain and accompanying uncon-

sciousness occurred later.' " The case was permitted to go to the jury.

In *Isaacson v. Boston, Worcester & N. Y. St. Ry. Co.*, 278 Mass. 378, 180 N. E. 118, 124, there was a collision between a bus and an automobile, causing a fire. The deceased was burned to death in this fire. The court said: "The evidence that he was 'standing up in the centre of the fire' and was groping with his hands is not naturally explainable as reflex movements, but tends to show consciousness and an intelligent attempt to escape from the fire. The nature of the groans as above described to the jury and the sharp intake of breath described cannot be said as matter of law not to indicate the pain and suffering of a dying man. Although the case is close upon this issue, we cannot say that the foregoing testimony did not indicate conscious suffering."

In *Mooney v. Tillery*, 185 Ark. 457, 47 S. W. 2d 1087, the deceased died within thirty minutes. "Witnesses testified that Andy Wilson groaned several times, twisted his body and shoulders, and was suffering pain. Some of appellants' witnesses testified that he was not conscious, but, as conceded by appellants, it was a question for the jury, and their finding is conclusive as to pain and suffering." This case grew out of an automobile accident.

In *Stone v. Sinclair Refining Co.*, 235 Mich. 53, 209 N. W. 118, a child was severely burned and died from an explosion of gasoline. Two physicians were called to the hospital. Both said she was crying or moaning and asked for water. Dr. Marshall expressed the opinion she was unconscious. Dr. Eckerman stated that if she had been unconscious he would not have called for or administered opiates to lessen the pain, and said: "All the time I was working on her or near her she was conscious. * * * It was because she asked for water I thought she was conscious." The testimony of other witnesses as to whether the child was conscious was conflicting. This case was permitted to go to the jury.

In *Nadeau v. Inhabitants of Taunton,* 247 Mass. 104, 141 N. E. 608, the deceased stepped on a live electric wire. "The medical examiner testified to a burn from electricity between the thumb and first finger of the right hand which extended to the bone; that his feet were burned from contact with the wire, and his body was blackened. Six eyewitnesses heard him 'groan', some of them as many as six times, while he was falling, or after he went down. Another testified, 'When he fell he cry out, and he cries two or three minutes afterwards, and then he stiffened right up', and that he made an outcry or sound for 'two or three minutes after he fell on the wire.' " This case went to the jury. See *Allison v. Sessa,* 302 Mass. 302, N. E. 2d 72; *Allicia v. Boston, R. B. & L. R. Co.,* 294 Mass. 488, 2 N. E. 2d 457; *Thornhill, v. Davis,* 121 S. C. 49, 113 S. E. 370, 24 A. L. R. 617.

From these authorities we think, in order to recover in a case like this, three elements must concur: 1. that the defendant's negligence was the direct and proximate cause of the accident; 2. that the deceased lived after the accident; and 3. that between the time of the accident and the time of death he suffered conscious pain. If these elements are established the plaintiff is entitled to recover. The period between the accident and death may be short, yet, if the evidence shows that the decedent lived after the accident, was conscious and suffered pain, his representative is entitled to recover in an action like the one in this case. The burden of proof is upon the plaintiff to show by a preponderance of evidence the elements necessary to establish the action. As the lower court was asked to rule as a matter of law that there was no evidence legally sufficient to establish conscious pain in this case, it was bound to consider the testimony before it in the most favorable light to the plaintiff, and we must so view the plaintiff's testimony. It is contended that Dr. Whaley's testimony does not afford a basis for him to express an opinion as to whether the deceased suffered conscious pain. In the direct testimony he said the deceased suffered conscious pain, but

on cross-examination he stated: "I felt that in the process of helping Mr. Carey up he gave out more groans * * * I thought probably he was conscious to more pain". In *Mangione v. Snead*, 173 Md. 33, at page 45, 195 A. 329, at page 333, it is said: "The witness (a doctor) said later that he thought 'probably he had had it at the accident.' (meaning a concussion of the brain) Such an opinion has been held sufficiently definite." There was no objection to the questions asked Dr. Whaley. Dr. Whaley's testimony may have been weakened by cross-examination, but its probative force was not destroyed.

Dr. Long, who received Carey at the hospital at Salisbury, expressed his opinion that Carey was dying when he arrived at the hospital, and further said it was his opinion that Carey did not suffer conscious pain from the time of the injury until his death. Upon this question Dr. Whaley and Dr. Long differ, as did the doctors in the case above referred to. This case is a narrow one, but viewing the facts in the light most favorable to the plaintiff, we cannot say that the lower court was wrong in submitting this case to the jury. The evidence in the case did not permit the lower court to take the case from the jury on the question of whether or not the deceased suffered conscious pain.

Under the second point, the appellants, in their brief, say: "The rule has long been established by the Supreme Court of the United States that conscious pain incidental to death is not compensable under the Federal Employers' Liability Act". They quote *St. Louis, Iron Mountain, & Southern Ry. Co. v. Craft*, 237 U. S. 648, 35 S. Ct. 704, 59 L. Ed. 1160. In that case the deceased was pinned under a freight car for about fifteen minutes before he was extricated. The court said: "The first objection must, as we think, be overruled. The record discloses that the decedent survived his injuries more than a half hour, and that they were such as were calculated to cause him extreme pain and suffering, if he remained conscious. A car passed partly over his body, breaking

some of the bones, lacerating the flesh and opening the abdomen, and then held him fast under the wheels with a brake rod pressing his face to the ground. It took fifteen minutes to lift the car and release his body, and fifteen minutes more to start him to the hospital in an ambulance. It was after this that he died, the time not being more definitely stated. As to whether he was conscious and capable of suffering pain the evidence was conflicting. Some of the witnesses testified that he was 'groaning every once in a while', and that when they were endeavoring to pull him from under the car 'he would raise his arm' and 'try to pull himself', while others testified that they did not notice these indications of consciousness, and that he seemed to be unconscious from the beginning. The jury found that he was conscious, and both state courts accepted that solution of the dispute. Of course, the question here is not which way the evidence preponderated, but whether there was evidence from which the jury reasonably could find that while he lived he endured conscious pain and suffering as a result of his injuries. That question, we are persuaded, must be answered in the affirmative."

The court did not hold, in that case, that the deceased was dying when he was found pinned under the freight car, although he was terribly mutilated. He probably did not live as long as Mr. Carey lived after he was struck by the bus driven by White. It seems apparent that Carey would not have been considered as dying immediately after the accident, under the ruling in the Craft case, and if we were inclined to adopt the rule suggested, this case would go to the jury on the question of whether Carey was dying immediately after he was injured. The rule stated by the Supreme Court in two cases arising under the Federal Employers' Liability Act was the ground of decision in only one case, in which the interval, if any, before death was very short. *Great Northern R. Co. v. Capital Trust Co.*, 242 U. S. 144, 37 S. Ct. 41, 61 L. Ed. 208. We cannot say that conscious pain and suffering incidental to death cannot be com-

pensated for in a case such as this one. On the contrary, we hold that an action will lie for such conscious pain.

Finding no error in the rulings of the lower court, the judgment will be affirmed.

*Judgment affirmed, with costs.*