974 A.2d 978

**Thomas FREED, et al.,**

v.

**D.R.D. POOL SERVICE, INC.**

**No. 2258, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

July 6, 2009.

478

Andrew H. Baida (Benjamin Rosenberg, Douglas J. Furlong, Rosenberg, Martin, Greenberg, LLP, on the brief), Baltimore, (Gary A. Wais, H. Briggs Bedigian, on the brief), Owings Mills, for appellant.

Steven R. Migdal (Buck, Migdal & Myers, Chartered on the brief), Annapolis, for appellee.

Panel: KRAUSER, C.J., SALMON and ROBERT L. KARWACKI (Retired, Specially Assigned), JJ.

SALMON, J.

On June 22, 2006, Connor Freed ("Connor"), who was five, was taken by Paul Carroll, an adult family friend, to the swimming pool at the Crofton Country Club, in Crofton, Maryland. At approximately 4:30 that afternoon, Connor drowned in the Country Club's swimming pool. The pool was managed at the time of the drowning by D.R.D. Pool Service, Inc. ("the pool company"), appellee.

Less than one month after his death, Connor's parents, Thomas Freed and Deborah Neagle–Webber, as the personal representatives of their son's estate, filed a survivorship action in the Circuit Court for Anne Arundel County. Their complaint named, *inter alia,* the pool company as a defendant and asserted that Connor's death was caused by the negligence of the pool company. In the same lawsuit, Connor's parents also brought a wrongful death action against the pool company, in which they each sought recompense for their grief, mental anguish, etc. that they experienced as a result of the drowning.

Prior to trial, the pool company filed a motion for summary judgment in which it argued that the estate of Connor Freed was precluded from recovering damages based on the claim that Connor had experienced conscious pain and suffering prior to his death. According to the movant, that claim was barred because the estate could not produce evidence that would support such a claim.

The pool company's motion was supported by deposition excerpts from various witnesses who had testified during the discovery phase of the case. The parents filed an opposition, supported by a copy of the autopsy report prepared by the Anne Arundel County Medical Examiner along with additional deposition excerpts. The issue was thoroughly briefed by all parties and, after a hearing in the circuit court, summary judgment was granted in favor of the pool company. This ruling removed from the case the issue of whether Connor had suffered conscious pain and suffering prior to his death.

The jury returned a $4,006,442.00 verdict in favor of the parents in their wrongful death suit. Pursuant to a statutory "cap" imposed in Maryland on non-economic damages, the wrongful death award was reduced to $1,002,500.00. *See* Md.Code Ann. (2008 Repl.Vol.), Cts. & Jud. Proc. Article, section 11–108 (hereinafter "the Cap Statute").

Connor's parents filed a timely motion to alter or amend the judgment in which they challenged the constitutionality of the Cap Statute. The parents' motion was denied and this timely appeal followed.

On appeal, the parents, as they did below, argue that Maryland's Cap on non-economic damages violates the equal protection guarantee under the United States Constitution and the Maryland Declaration of Rights. The Court of Appeals has twice rejected this exact argument. *See Oaks v. Connors*, 339 Md. 24, 37, 660 A.2d 423 (1995); *Murphy v. Edmonds*, 325 Md. 342, 370, 374–75, 601 A.2d 102 (1992). As appellants recognize, this Court has no discretion but to follow the law as enunciated by the Court of Appeals. *See Runnels v. Newell*, 179 Md.App. 168, 203, 944 A.2d 1183 (2008) *aff'd, in part rev'd in part on other grounds.* 407 Md. 578, 967 A.2d 729 (2009). In appellants' words, the issue concerning the constitutionality of the statutory cap on non-economic damages is raised in this Court simply "to preserve it in the event the Court of Appeals reviews this case." Based on *Oaks* and *Murphy*, both *supra*, we shall reject appellants' argument that the Cap Statute is unconstitutional.

The main issue presented in this appeal is whether the motions judge erred when she granted summary judgment in favor of the pool company as to the Estate's claim for recompense for Connor's conscious pain and suffering that immediately preceded his death by drowning. We shall hold that the court did err and remand the case to the Circuit Court for Anne Arundel County for a new trial to determine what damages, if any, the Estate is entitled to recover for Connor's conscious pain and suffering.

## I.

Sometime between 4:15 and 4:30 p.m. Connor approached Paul Carroll, the adult who had brought him to the pool. He asked Mr. Carroll to remove his life jacket so that he could go to the bathroom. Mr. Carroll did so and told the child to come back when he was done. Mr. Carroll saw Connor go into the restroom area and then turned his attention to Brice and Peyton Dameron, two children who were about Connor's age and who were then playing in the pool. These children had also been brought to the pool by Mr. Carroll. After a "couple of minutes," Mr. Carroll began to wonder about Connor's whereabouts. He was concerned because he thought that it was taking the child a little bit longer than usual to go to the bathroom.

After a "couple of [more] minutes," Mr. Carroll asked Brice Dameron to go to the restroom to "check on Connor." According to Mr. Carroll, there were thirty to forty people in the pool at that time, "mostly kids." Mr. Carroll continued to watch Peyton who was "jumping in and out" of the pool. After an interlude, Peyton told Mr. Carroll that there was "somebody floating" in the pool. Mr. Carroll and another adult walked to the side of the pool and saw Connor, face down, with his arms hanging by his side. In Mr. Carroll's words, Connor was in "the dead man's float" position. Emergency help was immediately summoned and lifesaving measures were commenced. But from the time his body was discovered, until he was pronounced dead, Connor never regained consciousness.

In pretrial discovery, no eyewitnesses were found who saw Connor enter the pool after he left the bathroom. And no witnesses came forward who saw him struggle in the pool prior to his death.

An autopsy report showed that Connor died of drowning. The medical examiner found "no evidence of significant recent injury." A small (1/4 × 1/8) inch abrasion was found on the child's lower back. The manner of death was accidental.

## II.

In preparation for trial, Connor's parents hired Dr. Jerome H. Modell to review the case and render an expert opinion as to whether Connor experienced conscious pain and suffering immediately prior to his death. Dr. Modell is a Florida physician specializing in anesthesiology and intensive-care medicine. In 1971, he was the author of a book titled "The Pathophysiology and Treatment of drowning and near-drowning." More recently, in 2002–2003, he was a consultant to the World Congress on drowning. He has treated more than 100 near-drowning victims in his clinical practice.

During his deposition testimony, Dr. Modell said that he based his opinion concerning Connor's conscious pain and suffering, in part, on his personal experience as a doctor and on animal experiments. He also relied on a report that was prepared by a group of international experts who participated in the 2002 World Congress on drowning. The report by these experts was published in the Journal of Circulation in the United States and the Journal of Resuscitation in Europe. In his deposition, Dr. Modell explained the term "pathophysiology of drowning" as follows:

The pathophysiology of drowning begins when the mouth and nose first become submerged in the water. At that point in time, the first reaction is to voluntarily breath hold to avoid aspirating water. The carbon dioxide tension then builds up to a point where you can no longer voluntarily avoid the sensation to breathe.

At that point in time you start to take a breath and when you get water in the oral pharynx, that water stimulates the larynx to go into laryngospasm to further protect the airway from aspiration of water. And as a result you try to breathe but you can't because you are totally obstructed. It's as though someone were suffocating you or you put a clamp on your trachea.

As a result, you will build a tremendous negative pressure within your chest as your diaphragm tries to pull in air, which you can't, or water. And as a result the intercostal

muscles will sink into the chest rather than rise. <u>This</u> <u>causes a great deal of pain and discomfort of pain and</u> <u>suffering and this process lasts for a minute and a half to</u> <u>two minutes.</u>

At a minute and a half to two minutes, you no longer can sustain laryngospasm because of the level of cerebral hypoxia and your larynx will then relax and you will then start to actively inhale water.

\* \* \*

(Emphasis added.)

Dr. Modell testified, to a reasonable degree of medical probability, that Connor experienced pain for about 2 minutes during the drowning process. His exact testimony in this regard was as follows:

As far as his consciousness is considered, he would have been conscious for approximately 2 minutes before he would lose consciousness. Secondary to cerebral hypoxia. And that would correspond not only to what's been reported in the literature, but also studies we've done in experimental animals where we actually measured arterial oxygen tension with varying time periods simulating laryngospasm and drowning.

Dr. Modell also relied on an article by a Dr. Lowson, who had been shipwrecked in the early 1900's and had almost drowned. In an article written by Dr. Lowson and published in 1903, the doctor "vividly" described what happened to him physically during the time he was submerged.

Dr. Modell admitted at his deposition that not all drownings are alike, because there are medical conditions that can cause a person to be unconscious before he or she takes in water. For instance, a person in a pool could be knocked unconscious by a blow or the person could intentionally hyperventilate, causing a blackout. Dr. Modell ruled out those possibilities because he thought it highly unlikely that a 5–year–old would intentionally hyperventilate to the extent necessary to cause a

blackout, and there was no evidence in the autopsy report that he received a blow that would have rendered him unconscious.

The pool company retained Dr. H. Brandis Marsh, a clinical cardiologist, as an expert. He has an additional interest in what he termed "interventional cardiology," meaning that he performs cardiac catheterizations, angioplasties, and supervises exercise tests used to diagnose heart problems.

Dr. Marsh admitted at deposition, based on his review of the autopsy report and other records concerning Connor's drowning, that there was no evidence that Connor had "any type of injury which would have rendered him unconscious prior to entering the pool." He conceded that there was no evidence that Connor "suffered from some type of underlying etiology that predisposed him to unconsciousness." He also said that it was "more likely than not that [Connor] was conscious when he began to drown." Nevertheless, Dr. Marsh testified that it would be "speculative to assume" that Connor "experienced conscious pain and suffering" prior to his death. The basis for his "too speculative" opinion was that "there's no data to support that claim." He was then asked whether "common sense dictates, . . . that when a person is deprived of air, there is a period of pain." He responded that "common sense dictates that someone in [that] situation will flail around and draw attention to themselves and yet that doesn't happen either, so I am not sure what the role of common sense is especially when you're talking about medical issues." His answer continued:

> The only data that I've seen anywhere here with respect to patients experiencing conscious pain and suffering when drowning is the report of this doctor who drowned in 1900[sic] and Dr. Modell's statement that some of the patients he's talked to who he has taken care of in his career reported similar things. We don't know how many he's talked to, much less what percentage of them said what, when and under what circumstance. To the best of my knowledge, none of that is published in the peer reviewed literature and at that point it's anybody's guess.

Nevertheless, Dr. Marsh testified that he did not disagree with the portion of Dr. Modell's deposition testimony in which he described the pathophysiology of drowning.

## III.

In her oral opinion, granting summary judgment in favor of the pool company and against the personal representatives of the estate of Connor Freed, the court said:

> I believe that from what the parties have said that there was no material fact in dispute and I believe that there ... [is no] dispute that the child was conscious for some period of time and I do not think that there is ... any testimony, clearly no eye witness to say when that consciousness became an unconsciousness. ... I understand that [plaintiffs' counsel believes] that [he] can distinguish *[UMMS v.] Malory* [143 Md.App. 327, 795 A.2d 107 (2001)] and I believe that *Malory* requires that there be some objective measure before there is an ability to take to the jury the conscious pain and suffering [issue].

## IV.

We have found no Maryland case dealing with the issue of whether the personal representative of a drowning victim can recover for the victim's conscious pain and suffering when, as here, there is no eyewitness testimony concerning the drowning. There are, however, cases from our sister states as well as federal decisions concerning this issue. *See* John P. Ludington, Annotation, *When is Death "Instantaneous" for Purposes of Wrongful Death or Survival Action,* 75 A.L.R.4th 151, § 8 (1989). But before analyzing cases from other jurisdictions, it is useful to review some well established principles set forth in Maryland cases dealing with the issue of what must be proven in order to be awarded recompense for the conscious pain and suffering of a decedent. That exact issue was addressed about sixty years ago in the case of *Tri–State Poultry Coop. v. Carey,* 190 Md. 116, 125, 57 A.2d 812 (1948).

In the *Tri–State Poultry* case, the decedent, a bicyclist named Orrick Carey, was struck by a bus and suffered an injury to the base of his skull. *Id.* at 118, 57 A.2d 812. Immediately after the accident, Carey was bleeding. *Id.* Carey was promptly transported to the home of a Dr. Whaley, who lived nearby. *Id.* at 118–19, 57 A.2d 812. When Dr. Whaley first saw Carey, the latter moaned and groaned, and Dr. Whaley administered morphine. *Id.* at 119, 57 A.2d 812. Carey died about forty-five minutes after Dr. Whaley first examined him. *Id.*

Dr. Whaley was asked at trial if Carey "was conscious to such a degree that he was suffering pain?" Dr. Whaley answered: "I would say yes. I don't think he was totally conscious. He did not answer his name. But I do think he was conscious enough to elicit pain." He also said that he administered morphine "for pain and to prevent shock." *Id.* at 119, 57 A.2d 812. On cross-examination, Dr. Whaley admitted that the fact that a man is groaning does not necessarily mean he is conscious. *Id.* at 120, 57 A.2d 812. He was asked: "you don't mean to tell the Jury definitely and positively that Mr. Carey was conscious at the time you saw him, do you?" Dr. Whaley replied "I felt that in the process of helping Mr. Carey up he gave out more groans and so forth, I thought probably he was conscious to more pain. That was my reason for saying he was conscious of some pain." *Id.*

Another doctor testified that he examined Carey at the hospital. *Id.* at 126, 57 A.2d 812. That doctor opined that Carey did not suffer conscious pain from the time of his injury until his death. *Id.* Under such circumstances, the Court of Appeals said, *id.:*

> This case is a narrow one, but viewing the facts in the light most favorable to the plaintiff, we cannot say that the lower court was wrong in submitting the case to the jury . . . . on the question of whether or not the deceased suffered conscious pain.

Prior to reaching the holding we have just quoted, the Court of Appeals reviewed authorities from numerous jurisdictions

concerning the sufficiency of conscious pain and suffering evidence. The Court then said:

From these authorities we think, in order to recover in a case like this, three elements must concur:

1. that the defendant's negligence was the direct and proximate cause of the accident; 2. that the deceased lived after the accident; and 3. that between the time of the accident and the time of death he suffered conscious pain. If these elements are established the plaintiff is entitled to recover. *The period between the accident and death may be short, yet, if the evidence shows that the decedent lived after the accident was conscious and suffered pain, his representative is entitled to recover in an action like the one in this case.* The burden of proof is upon the plaintiff to show by a preponderance of evidence the elements necessary to establish the action.

*Id.* at 125, 57 A.2d 812 (emphasis added).

Since *Tri–State Poultry* was decided, the aforementioned test has not changed. *See Beynon v. Montgomery Cablevision Ltd. P'ship*, 351 Md. 460, 508–09, 718 A.2d 1161 (1998); *Univ. of Md. Medical Sys. v. Malory*, 143 Md.App. 327, 346 (2001). The *Beynon* case dealt with the issue of whether pre-impact fright or any other form of mental or emotional disturbance or distress suffered by an accident victim, who instantly dies upon impact, was legally compensable. *Id.* at 463, 718 A.2d 1161. The *Beynon* Court held that the estate of a decedent could recover such damages because, in the event the deceased had lived, he would have been able to recover them. *Id.* at 500, 718 A.2d 1161. In the course of its opinion, the Court said that "[d]irect evidence is not necessary. What is required is evidence from which a reasonable inference could be drawn that the decedent experienced fear or fright." *Id.* at 508, 718 A.2d 1161.

■ The teaching of the *Beynon* case, as applied to this case, is that Connor's parents were not required to produce eyewitnesses or other direct evidence that their son suffered conscious pain and suffering prior to his death. Instead, in

order to survive a motion for summary judgment, the personal representatives of Connor's estate were required to produce evidence from which a reasonable inference could be drawn that the decedent experienced fear or fright or conscious pain while he was in the process of drowning.

■ The evidence, which we deem sufficient, showing conscious pain and suffering in this case was the following: 1) Connor, a healthy five-year-old, entered the pool without adult supervision and without a life preserver; 2) he received no blow to the head prior to drowning, nor did he have any physical problem that would have rendered him unconscious prior to going under water; 3) as the pool company's own expert admitted, it was more likely than not that when Connor started to drown he was conscious; and 4) once his head was under water he experienced the usual pain and suffering associated with drowning, as described by Dr. Modell when he explained the pathophysiology of drowning.

As mentioned previously, the motions judge in this case granted summary judgment because she did not think that the *Malory* case was distinguishable from the one *sub judice*. Jamal Malory, age two, arrived at the Emergency Room of the University of Maryland Hospital in Baltimore at noon on March 15, 1996. 143 Md.App. at 334, 795 A.2d 107. The child was experiencing respiratory problems. *Id.* at 332, 795 A.2d 107. He was released from the hospital at 4:05 p.m. that same day. *Id.* at 334, 795 A.2d 107. At home on the evening of his discharge, Jamal's health improved and he was able to go about his usual activities. He was given a bath, Vapor rub was applied to his chest and nose, and he went to sleep in his mother's bed. *Id.* at 335, 795 A.2d 107. During the night, the child woke up frequently, coughing and crying. *Id.* The next morning, at 10:30 a.m., Jamal's mother awoke to find her son lying in bed unresponsive. *Id.* at 335, 795 A.2d 107. Although cardiopulmonary resuscitation ("CPR") was administered, Jamal never regained consciousness, never moved or opened his eyes, and was otherwise non-responsive. *Id.* at 335, 795

A.2d 107. At 11:25 a.m. on the morning of March 16, Jamal was pronounced dead. *Id.*

In *Malory,* the plaintiffs contended that the defendant's hospital was guilty of medical malpractice by not keeping Jamal overnight for monitoring. *Id.* at 332, 795 A.2d 107. One of the issues presented in the *Malory* case was whether the trial judge committed reversible error in allowing the jury to consider the claim of Jamal's estate for the decedent's conscious pain and suffering. *Id.* at 333, 795 A.2d 107. We held that the court erred in allowing the jury to consider that issue. Judge Arrie Davis, speaking for this Court, said:

> By the accounts of all witnesses at trial, Jamal was unconscious from 10:30 a.m. on March 16, 1996, until 11:25 a.m. that same morning, when he was pronounced dead. [Jamal's mother,] who first found Jamal, testified that he was unconscious when she awoke that morning; Janet, who performed CPR on her grandson, testified that he stayed unconscious despite her efforts; the paramedics and firemen, who answered appellees' "911" call, testified that he was unconscious at all times while they were present; and the health care providers at appellant's facility all maintained that Jamal was unconscious upon arrival at the ER. Appellees contend that the testimony of [Doctor] King and [Doctor] Carroll satisfies the evidentiary requirements set forth in *Ory;* however, this testimony is mere speculation and Maryland has long followed the general principle that, "if compensatory damages are to be recovered, they must be proved with reasonable certainty, and may not be based on speculation or conjecture." *Beynon,* 351 Md. at 513, 718 A.2d 1161 (Wilner, J., dissenting). It was, therefore, reversible error for the trial court to allow the issue of damages for conscious pain and suffering to go to the jury.

*Id.* at 384, 795 A.2d 107.

This case is distinguishable from *Malory* because in that case the decedent was unconscious at all relevant times. The same was not true for Connor. The experts for both sides were in agreement that Connor did not have any pre-existing

condition or pre-death injury that would have rendered him unconscious *prior to the time that he began to drown.* The medical experts for both the plaintiffs and the defendant also agreed that it was probable that Connor was conscious when he first entered the swimming pool. When, as here, a well qualified expert for the moving party admits that the victim was conscious when he began to drown and also admits that the pathophysiology of drowning was as described in the deposition testimony of an opposing expert, we fail to see how the evidence that the child experienced at least some pain can be characterized as too speculative. In reaching this conclusion, we are mindful of the fact that in any case where we are called upon to consider whether the motions judge should have entered summary judgment, we are required to "construe the factual record in the light most favorable to the non-movants." *Newell, supra,* 407 Md. at 607, 967 A.2d 729. Moreover, in such cases, it is not our job to resolve factual disputes; instead, we endeavor to "merely determine whether they exist and 'are sufficiently material to be tried.'" *Id.* (quoting *Sadler v. Dimensions Healthcare Corp.,* 378 Md. 509, 534, 836 A.2d 655 (2003)).

■ The personal representatives of Connor's estate take the straight-forward position in this appeal that it was for the jury to decide whether, and to what extent, Connor suffered conscious pain and suffering. In response, rather than addressing that issue head on, appellee address the issue obliquely by arguing that "the lower court was correct in excluding the testimony of appellants' expert, Dr. Jerome Modell, and therefore denying the claim in the survivorship action for conscious pain and suffering." The short answer to that contention is that the motions judge at no time indicated that she was excluding from her consideration the testimony of Dr. Modell.[1]

---

1. Usually, we will not affirm the grant of summary judgment on any ground not relied upon by the motions judge. *See Johnson v. MacIntyre,* 356 Md. 471, 480, 740 A.2d 599 (1999). There is an exception, however, to that rule. The exception, which is not here applicable, is

■ We now turn to the basis upon which the motions judge did grant summary judgment. As mentioned earlier, the circuit court said in its oral opinion granting summary judgment in favor of the pool company that "*[UMMS v.] Malory* requires that there be some objective measure before there is an ability to take to the jury the conscious pain and suffering." The motions judge also emphasized that although there was no dispute that Connor was "conscious" for some period of time, there was "no testimony, clearly no eyewitness testimony to say when the consciousness became ... unconsciousness." We interpret the court's "objective measure" language, when read in conjunction with the motions court's observation that there was no eyewitness testimony as to how long the decedent was conscious, as imposing a requirement that the plaintiff present direct evidence concerning how long the victim consciously suffered pain. But as already mentioned, direct evidence was not necessary; circumstantial evidence is entirely sufficient. *Beynon, supra,* 351 Md. at 508, 718 A.2d 1161. Moreover, the exact length of time fright or pain was experienced need not be shown. *Tri–State Poultry, supra,* 190 Md. at 125, 57 A.2d 812.

In support of the trial judge's ruling, the pool company focuses upon the expert testimony of Dr. Modell and attempts to denigrate it. Appellee argues:

Dr. Modell based his opinion entirely on an article published by a shipwrecked doctor in 1902[sic] and conversations he had with several of his former patients who had experienced near drowning episodes. The opinion itself was non-specific to Connor Freed but was Dr. Modell's generic recital of "the drowning process." As Dr. Modell himself put it, "I can't specifically tell you exactly how many seconds it takes anybody to drown. I can tell you within

that an appellate court will affirm the grant of a summary judgment, on grounds not relied upon by the motions judge, if the latter had no discretion but to grant summary judgment. *See Stanley v. Stanley,* 175 Md.App. 246, 266, 927 A.2d 40 (2007).

reasonable medical probability what the time course of the drowning process is."

(Emphasis omitted.)

■ Dr. Modell testified that during his career as an anesthesiologist he had the opportunity of treating "well over 100 drowning victims," who had been successfully resuscitated. Those patients were treated "in an intensive care environment" where he obtained histories of his patients, including those of children, who had related experiences "not different" from that related by Dr. Lowson. He also relied on animal experiments and, as already mentioned, Dr. Modell testified, to a reasonable degree of medical certainty, that Connor "underwent the drowning process" as described by a group of international experts who presented a paper to the World Congress on drowning in 2002 and published it in the Journal of Circulation in the United States. A physician with Dr. Modell's specialty and experience was certainly qualified to testify as to the physical effect that ingestion of water would have on the lungs, heart and brain of a healthy five-year-old.

It is true, as appellee points out, that Dr. Modell was unable to state, specifically, how many seconds it takes a particular person to drown. But Dr. Modell was able to testify to a reasonable degree of medical probability, that Connor would have been conscious "for approximately two minutes" before he lost consciousness. Such testimony was far more exact than that of Dr. Whaley, which the *Tri–State Poultry* Court said was sufficient to create a jury issue as to the amount, if any, of conscious pain suffered.

It is also true, as appellee stresses, that Dr. Marsh disagreed with Dr. Modell's testimony. The defense expert said that Dr. Modell had engaged in "pure speculation" and opined that there was no "objective evidence" as to how long Connor suffered. In our view, whether Dr. Modell's opinion or that of Dr. Marsh was to be credited was a jury issue.

Appellee also argues that under Maryland law there must be "some objective factual basis" to support a conscious pain and suffering award. According to appellee, there was no

such "objective" evidence in this case because no witness saw Connor enter the pool, nor, as far as anyone has been able to determine, did anyone observe Connor in distress while in the water prior to being found unconscious. That argument was answered in *Beynon, supra,* when the Court said "[d]irect evidence is not necessary": the test is whether the plaintiff has presented "evidence from which a reasonable inference could be drawn that the decedent experienced fear or fright." 351 Md. at 508, 718 A.2d 1161.[2]

Appellee lastly argues that Connor "may have blacked out as soon as he entered the water or sometime after he was in the water but before he drowned. Everything is guess work because no one saw him or heard him." Whether Connor blacked out before the drowning process began was a subject that was appropriate for expert medical testimony based upon the autopsy report and evidence as to Connor's prior state of

---

**2.** Addressing whether the representative of the decedent in *Beynon* should have been permitted to recover damages for "pre-impact fright," the Court of Appeals said:

Also, permitting a jury to determine pre-impact fright requires the same reasoning and common knowledge that *we allow jurors to exercise in determining non-economic, pain and suffering damages in other tort actions,* which, like assault, require an assessment of a victim's fear and apprehension. *Direct evidence is not necessary.* What is required is evidence from which a reasonable inference could be drawn that the decedent experienced fear or fright. Such evidence exists in this case, the 71½ feet long skid marks made by the decedent's vehicle immediately prior to the actual crash. A jury reasonably could have inferred from that evidence that the decedent was aware of the impending peril; that he was going to crash, and attempted an evasive maneuver to avoid it.

*Id.* at 508, 718 A.2d 1161 (emphasis added).

The *Beynon* Court went on to say *id.* at 508–09, 718 A.2d 1161:

A jury reasonably could have inferred from the evidence that the decedent was aware of the impending peril, that he was going to crash, and attempted an evasive maneuver to avoid it. The jury equally reasonably could have concluded that the decedent suffered emotional distress or fright during that period before the crash, after he became aware of the imminent danger and began braking. This is not rank speculation.

The same type of inference as *Beynon* permitted could have been drawn in this case, except that the decedent, rather than expecting a terrible crash, expected death by drowning.

health. (The physicians retained by both parties determined the scenario that appellee suggests (starting to drown while already unconscious) was unlikely). We therefore disagree with appellee's characterization of this testimony as "guesswork."

Appellee cites five out-of-state cases in support of its position. The cases are *Phiri v. Joseph*, 32 A.D.3d 922, 822 N.Y.S.2d 573, 574 (2006) (eye witnesses to an accident in which decedent was struck by a bus, testified, without contradiction, that they did not see the decedent move after the accident and did not know whether he had stopped breathing; evidence held insufficient to show conscious pain and suffering); *Cochrane v. Schneider Nat'l Carriers, Inc.*, 968 F.Supp. 613, 617 (D.Kan.1997) (claim for conscious pain and suffering disallowed because plaintiff failed to show that decedent was conscious at some time after the impact); *Feldman v. Allegheny Airlines, Inc.*, 382 F.Supp. 1271 (D.Conn.1974) (representatives of the victim of an airplane crash denied recovery when no evidence was presented as to the location within the fuselage at which the decedent's body was found and no proof presented from which it could be inferred that she was conscious after the impact); *In re Sincere Navigation Corp.*, 329 F.Supp. 652 (E.D.La.1971) (representatives of seventeen of the crewman who were killed while aboard a coast guard vessel that collided with a freighter were held ineligible to receive recompense for the decedents' conscious pain and suffering when none of the bodies were ever recovered, no evidence was presented as to whether the decedents were asleep or awake at the time of the collision, and no evidence was presented that any individual crewman "suffered a moment" prior to death) *modified on other grounds*, 529 F.2d 744 (5th Cir.1976) [3]

---

**3.** The appellee also cites the case of *Davis v. Parkhill-Goodloe Co., Inc.*, 302 F.2d 489 (5th Cir.1962), in which the trial judge granted judgment in favor of the defendant. On appeal to the Fifth Circuit Court of Appeals, the Court was not presented with the issue whether the evidence was sufficient to show conscious pain and suffering on the part of the decedent. Nevertheless, when it remanded the case, the

There are a number of cases from other jurisdictions in which the court held a jury question was presented as to whether the victim endured conscious pain and suffering when the evidence was less substantial than that presented by the appellants in this case. In *Clark v. Manchester,* 64 N.H. 471, 13 A. 867 (1888), a three and one-half year old boy drowned in a stagnant, muddy, and slimy pool of water in what once had been a city reservoir. There were no eyewitnesses. *Id.* at 869. The New Hampshire Supreme Court said that accurately speaking, "there is no such thing in any case as death happening simultaneously with the injury causing it, and still less in cases of drowning." *Id.* The Court went on to say that the condition of the water afforded competent evidence from which a jury might legitimately infer not only that the death was not instantaneous, but also that the child experienced both physical and mental pain and suffering, for which neither eyewitness nor expert witness testimony was necessary. *Id.*

In *Cook v. Ross Island Sand & Gravel Co.,* 626 F.2d 746 (9th Cir.1980), a deckhand fell off a barge into the Columbia River. The fall was witnessed by the ship's captain. When the captain later testified, he did not indicate whether the

---

Court instructed the trial court to determine whether sufficient evidence existed to allow the issue of conscious pain and suffering to go to the jury. In doing so, the Court said:

> Great ingenuity was exercised in putting forward a medical theory based upon expert testimony of the probable length of time it took for a person finally to expire in drowning. But there are so many unknowns in this unexplained slipping or falling of Davis into the water, that we should only say that substantial evidence will be required to sustain a finding of consciousness upon which to rest the permissible assumption of pain.

302 F.2d at 495.

The facts as set forth by the Fifth Circuit in the *Davis* case are sketchy. The case arose when a healthy, twenty-four-year-old seaman fell off a narrow ten foot plank and landed in the water. His body was found about twenty-four hours after the accident and the cause of death was determined to be drowning. *Id.* at 491. No one witnessed the accident. Until his body was found, the seaman's disappearance was unexplained. *Id.* Unlike the case *sub judice*, there was no evidence that, at the time the decedent entered the water, he was conscious.

victim had been conscious either during the fall or immediately afterwards. The deckhand's body was found three months later and at trial the decedent's representatives presented expert testimony that the cause of death was asphyxia from drowning and that the deckhand had not sustained a skull fracture. Plaintiff's expert, a pathologist, testified that based on the absence of any evidence of a skull fracture, he concluded that the decedent had been conscious when he entered the Columbia River, and that he had remained conscious for up to 2 ½ minutes after submersion. The Court held that taking the evidence in the light most favorable to the plaintiff, sufficient evidence was presented to raise a jury question as to whether the decedent had suffered conscious pain and suffering prior to death.

The Court of Appeals of Louisiana considered the claim of the survivors of a boat captain (Captain Wall) who fell between two barges moored together in a river. *Wall v. Progressive Barge Line, Inc.,* 703 So.2d 681 (La.Ct.App.1997). The *Wall* Court upheld a $50,000.00 award for the deceased's pain and suffering prior to death based on the fact that when the decedent's body was recovered there was no evidence of physical injury to the body, except for asphyxiation.

The Court of Civil Appeals of Texas reached a result similar to that in *Wall* in *Mitchell v. Akers,* 401 S.W.2d 907 (Tex.Civ. App.1966). In *Mitchell,* a boy, age three years and eight months, drowned in a private swimming pool located on the defendant's property. *Id.* at 908. The little boy had entered the pool area through an open gate. *Id.* No one witnessed the drowning, but a doctor who arrived on the scene shortly after the body was discovered examined the child and later opined "that the child died of drowning after struggling for 2 or 3 minutes before losing consciousness." *Id.* at 912. The doctor further testified that during the 2 or 3 minutes the child "probably endured physical pain and mental anguish." The basis of the doctor's opinion that the child was conscious when he entered the pool was based on the absence of any "bruises or marks on the child" that "might indicate that the child may have fallen against a hard object and become

unconscious before becoming immersed in the water." *Id.* The Texas Court of Civil Appeals held that such evidence was sufficient to support an award in favor of the estate for the child's conscious pain and suffering. *Id.* To the same effect, see *Kline v. Maritrans CP, Inc.,* 791 F.Supp. 455, 466 (D.Del. 1992) ("There is testimony that indicates Kline did not experience a pre-mortem injury that would render him unconscious and there is testimony delineating the time a person of Kline's physical stature could be expected to survive and remain conscious under the conditions. Therefore, the Court concludes that defendants' motion for summary judgment on the issue of damages for pain and suffering must be denied.").

For all the reasons stated above, we hold that the motions judge erred in granting summary judgment in favor of the pool company as to the claim made on behalf of Connor's estate for the child's pre-mortem conscious pain and suffering.

**JUDGMENT IN FAVOR OF D.R.D. POOL SERVICE, INC. AS TO THE CLAIM BY THE ESTATE OF CONNOR FREED FOR RECOMPENSE DUE TO THE CHILD'S CONSCIOUS PAIN AND SUFFERING, REVERSED; ALL OTHER JUDGMENTS AFFIRMED; COSTS TO BE PAID 50% BY APPELLEE AND 50% BY THOMAS FREED AND DEBORAH NEAGLE–WEBBER, JOINTLY.**